KEYES MARTIN & COMPANY, RESPONDENT, v. DIRECTOR,
DIVISION OF PURCHASE AND PROPERTY, DEPARTMENT
OF TREASURY, STATE OF NEW JERSEY, APPELLANT.

Argued December 10, 1984—Decided May 6, 1985.

*Joseph L. Yannotti,* Deputy Attorney General, argued the cause for appellant (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel.)

*Arthur N. D'Italia* argued the cause for respondent (*Chasan, Leyner, Tarrant & D'Italia,* attorneys.)

The opinion of the Court was delivered by

HANDLER, J.

Respondent Keyes Martin and Company (Keyes Martin) seeks the award of a contract to provide advertising and promotional services for the New Jersey State Lottery. After reviewing the bids submitted by all the companies competing for the contract, the State Lottery Commission (Lottery Commission) determined that Keyes Martin was the best qualified company. However, when it was later informed of business dealings between Daniel Gaby, the president of Keyes Martin, and Reese Palley, the Chairman of the Lottery Commission, the Commission recommended to the Director of the Division of Purchase and Property that Keyes Martin's low bid be rejected. The Director agreed with the recommendation of the Commission and awarded the contract to another agency.

An appeal was filed by Keyes Martin and the Appellate Division vacated the Director's final decision. A majority of the court determined that the contract should be awarded to Keyes Martin. A dissenting member of the court concluded that there should be further proceedings relating to Keyes Martin's qualifications to bid on public contracts. We granted

the Director's petition for certification, 97 *N.J.* 703 (1984), and also granted a motion to stay the lower court's decision. We now reverse and reinstate the Director's decision rejecting Keyes Martin's bid.

## I.

The New Jersey Lottery is authorized by the Constitution, *N.J. Const.* (1947), *Art.* IV, sec. VII, para. 2, and implementing legislation, *N.J.S.A.* 5:9–1 to –25. The operations of the State Lottery are conducted by the Division of the State Lottery in the Department of Treasury (Division) and supervised generally by the Lottery Commission. The Lottery Commission in the exercise of its supervisory responsibilities engages in extensive marketing, advertising, promotional and public relations activities to enhance the effectiveness of the State Lottery. To provide these services, it employs an advertising and public relations agency. These services have been regularly provided under successive, separate, two-year contracts that are awarded pursuant to public bidding as mandated by *N.J.S.A.* 52:34–6.

Keyes Martin had been the successful bidder or vendor for several years and it was the current vendor performing advertising and promotional services under a contract that had been awarded by the Division in September of 1980.[1] On January 19, 1983, in response to a Request for Proposals issued by the Division of Purchase and Property, Keyes Martin and six other agencies submitted comprehensive bid proposals containing detailed plans for achieving the specified goals of the Lottery Commission.

An Evaluation Committee consisting of staff members of the Lottery Commission and the Division reviewed the proposals submitted by the seven agencies. The Committee determined that Keyes Martin, which had submitted the lowest bid, was the

---

[1] Keyes Martin's contract had been extended by six months to cover the bidding period.

best qualified agency in terms of experience and technical approach. Accordingly, on March 22, 1983, the Committee recommended that the contract be awarded to Keyes Martin.

Before the Lottery Commission could act upon the Committee's recommendation, the State Treasurer received a letter from the Attorney General advising the Director to reject Keyes Martin's bid proposal. The basis for the Attorney General's opinion was an asserted business relationship between Daniel Gaby, the president of Keyes Martin, and Reese Palley, then Chairman of the Lottery Commission, during the time period that Keyes Martin was under contract to provide advertising and promotional services for the State Lottery. The Attorney General also referred to a complaint that had been filed by the Executive Commission on Ethical Standards charging Palley with conflicts of interest and the violation of several provisions of the Lottery's Code of Ethics.[2] Rejection of the Keyes Martin bid was suggested because "an award to that vendor would impair public confidence in the integrity of the operations of the State Lottery."

Acting in response to the Attorney General's recommendation, the Evaluation Committee was reconvened by Deputy Director of the Division of Purchase and Property (Deputy Director). The Committee was instructed to evaluate the bid proposals after eliminating from consideration Keyes Martin's bid. On May 23, 1983 the Committee issued an alternative award recommendation, naming Venet Advertising, Inc. (Venet) as the best qualified remaining agency. The Committee's recommendation was adopted by the Lottery Commission on May

---

[2] Palley was subsequently indicted by a State grand jury on charges of obstructing the Ethics Committee's investigation of his dealings with another prospective Lottery vendor, SynTech International, Inc.

On May 7, 1983, Palley was suspended from his position on the Lottery Commission by Governor Thomas H. Kean. On April 11, 1985, Palley admitted the violation of three provisions of the Code of Ethics in a consent agreement between Palley and the Executive Commission. He was also convicted of the obstruction charges, based upon a plea of guilty.

25, 1983, in a resolution requesting the Deputy Director to grant Venet the Lottery advertising contract. The Deputy Director awarded the advertising contract to Venet on May 31, 1983, notwithstanding a petition filed by Keyes Martin requesting review of the Lottery Commission's rejection of its low bid. The Deputy Director indicated that the award to Venet was contingent upon the success of Keyes Martin's protest.

On June 27, 1983 an informal hearing on the protest was held before an Assistant to the Director of Purchase and Property, acting as a hearing officer. The hearing was conducted for the purpose of affording Keyes Martin an opportunity to contest the factual basis from which the Lottery Commission drew its conclusion to reject the Keyes Martin bid. Accordingly, Keyes Martin's evidence was directed at demonstrating that the Attorney General's characterization of the relationship between itself and Reese Palley was inaccurate or unfair.

According to the evidence considered, there were business contacts involving a visit that Palley made in July of 1982 to the Republic of China to explore business opportunities for China Interface Corporation, a company in which Palley owned stock. Palley had mentioned that he would let Gaby know if he saw anything on his trips that would interest the advertising company, to which Gaby replied "Fine." On Palley's return, he asked Gaby to reimburse him for $200 spent in China for the services of a "consultant" and an interpreter, both employed to further the interests of Keyes Martin. Although Gaby had not authorized these expenditures, he did reimburse China Interface because of Palley's "good intentions" and the small amount involved.

Other contacts between Palley and Gaby, as reflected by the evidence, involved a discussion in August of 1982 about the possibility of Gaby becoming a stockholder in China Interface. Palley proposed that Gaby become a 16½% owner of the company, and Gaby said he "would seriously consider the matter," but no transaction ever ensued. Keyes Martin also provided

advertising and public relations services to China Interface. At Palley's direction Keyes Martin arranged for the placement of a classified advertisement in *The Wall Street Journal,* for which Keyes Martin received a standard fee. Additionally, at the suggestion of Palley, the advertising company submitted to China Interface a proposal for a program of advertisements for a Chinese beer that China Interface planned to market in this country. Although China Interface expressed an interest in Keyes Martin's proposal, it was not accepted and no advertising contract between the companies was executed.

The hearing officer found "that a 'business relationship' existed between Keyes Martin and China Interface" and that "Reese Palley played a role in affecting [sic] that relationship." [3] His report was submitted to the Lottery Commission, which passed a resolution again recommending that Keyes Martin's bid be rejected. The Commission concluded that

> based on the business relationship between Reese Palley and Keyes Martin, an award to Keyes Martin would not be in the public interest in that any appearance of wrong doing may impair public confidence in the integrity of the operations of the State lottery which is based primarily upon public confidence and whose operations are essential to the fiscal health of the State.

On July 29, 1983 the Director of the Division of Purchase and Property affirmed the Deputy Director's initial decision to reject the bid of Keyes Martin and to award the advertising contract to Venet.

## II.

We begin our analysis with the statutory provisions that define and control the responsibility of the Director of the Division of Purchase and Property in the award of public contracts under our system of competitive bidding. Public advertisement for bids is required under *N.J.S.A.* 52:34–6 with respect to "[a]ll purchases, contracts, or agreements, the cost

---

[3] It was also found that Keyes Martin did not afford China Interface favorable treatment based on Palley's position.

or contract price whereof is to be paid with or out of State funds...." After bids are requested and received,

> award shall be made with reasonable promptness by written notice to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the State, price and other factors considered. Any or all bids may be rejected when the State Treasurer or the Director of the Division of Purchase and Property determines that it is in the public interest so to do. [*N.J.S.A.* 52:34–12(d).]

It is clear from the language employed that the Legislature intended to confer upon the Director broad discretionary power to award or reject bids. All material factors, including price, must be considered in the ultimate determination of the most advantageous bid. The statute specifically authorizes the Director to reject bids when such action would be "in the public interest."

Based on the evident language and purpose of the statutory grant, as well as its history, the courts of this state have consistently accorded the Director considerable deference and great latitude in awarding public contracts. The predecessor statute, *N.J.S.A.* 52:34–3, repealed in 1954 by the present enactment, provided that

> the contract shall * * * be awarded to the lowest responsible bidder, except that the right to reject any or all bids is reserved to and may be exercised by the person or persons acting for or on behalf of the State in such matters * * *.

In *Commercial Cleaning Corp. v. Sullivan,* 47 *N.J.* 539, 548 (1966), after noting the pertinent differences between the present and former statutes, we were satisfied

> that the Legislature established much more flexible standards as a guide for the Director's decision to award a public contract to a particular bidder whether or not he is the low bidder. This is not to say the low bid may be ignored or treated as a minor consideration. It is a factor of great importance and not to be lightly discarded.

We also emphasized the distinction between the bidding requirements imposed on the State and those imposed on State subdivisions: The Local Public Contracts Law, in part, states that "[a]ll purchases, contracts or agreements which require public advertisement for bids shall be awarded to the lowest bidder." *N.J.S.A.* 40A:11–6.1. The absence of such restrictive

language in the bidding statute applicable to State contracts led us to conclude "that at this particular level of State activity, the legislative plan for awarding public contracts, which, as here, requires public advertising for bids, was to extend greater freedom of action to the Director and Treasurer than the circumscribed rule imposed on counties and municipalities." *Commercial Cleaning, supra,* 47 *N.J.* at 548–49.

The officials statutorily responsible for procuring goods and services under the public bidding laws are charged with the obligation of selecting the vendor whose offer will be the most advantageous to the State. Because of the multiplicity and variety of State needs, every award involves different considerations, depending on the requirements of the public body that seeks them and the nature of the goods or services sought. Consequently, in order for the Director to discharge his responsibility in selecting the most advantageous bid, he must be granted the flexibility to consider all relevant factors that would inform his choice. *See Blondell Vending v. State,* 169 *N.J.Super.* 1 (App.Div.), certif. den., 81 *N.J.* 333 (1979); *In re Honeywell Information Systems, Inc.,* 145 *N.J.Super.* 187 (App.Div.1976), certif. den., 73 *N.J.* 53 (1977).

In this case, in analyzing whether the Director properly exercised his statutory discretion, the scope of judicial review is limited. "[T]he lawmakers' purpose [in enacting *N.J.S.A.* 52:34–12(d) ] was to draw in the boundaries delineating the area of judicial intervention when an attack is made on the Director's award of a contract." *Commercial Cleaning, supra,* 47 *N.J.* at 549.

> [T]he judicial standard for appraising the propriety of the exercise of his discretion in awarding a contract or in rejecting a bid or a bidder should be that the courts will not interfere in the absence of bad faith, corruption, fraud or gross abuse of discretion. [*Id.*]

*Accord In re Honeywell Information Systems, Inc., supra.*

Despite its acknowledgement that its appellate function was clearly circumscribed, the Appellate Division in this case vacated the Director's award. Although the lower court did not

suggest that the legislatively-granted power to reject bids in the public interest was an unconstitutional delegation of power to an administrative agency, it held that the manner in which it was exercised was arbitrary and speculative. The court remarked that "[a]t the heart of the problem is the complete obscurity of the standard on which the Director acted. The 'appearance of wrongdoing' standard is no standard at all. It is completely non-objective." 196 *N.J.Super.* at 62. According to the court, respect for settled legal principles would prohibit the "public interest" from being "read to mean anything the Director chooses it to mean." *Id.* at 66. We disagree with the Appellate Division's analysis and conclusion.

It is fundamental that "within limits the Legislature may delegate its authority to a government agency." *Mt. Laurel Township v. Public Advocate of N.J.,* 83 *N.J.* 522, 532 (1980); *N.J. Chamber of Commerce v. N.J. Election Law Enforcement Comm'n,* 82 *N.J.* 57, 82–83 (1980). "[T]he Legislature may not vest unbridled or arbitrary power in an administrative agency," *Ward v. Scott,* 11 *N.J.* 117, 122 (1952), but "[a]s long as the discretion of administrative officers is 'hemmed in by standards sufficiently definitive to guide its exercise,' the delegation of legislative powers is not unconstitutional." *Mt. Laurel Township v. Public Advocate of N.J., supra,* 83 *N.J.* at 532, citing *Cammarata v. Essex County Park Comm'n,* 26 *N.J.* 404, 410 (1958). *Accord Matter of Egg Harbor Assocs. (Bayshore Centre),* 94 *N.J.* 358, 372 (1983).

Standards must accompany the delegation of power for three reasons:

First, [they] prevent the Legislature from abdicating its political responsibility and prevent undemocratic, bureaucratic institutions from wielding all-encompassing, uncontrollable government power. Second, limiting standards define the area in which the agency develops the experience and expertise that the legislature has neither the time nor resources to develop. With too broad a standard the agency stands in no better position than the legislature that created it. Third, and most important, standards facilitate judicial review of agency decisions, which guards against arbitrary and capricious governmental action. As long as the statutory standards achieve these purposes, such

standards should be considered sufficiently definite to pass constitutional muster. [*Mt. Laurel Township, supra,* 83 *N.J.* 532–33]

Our courts have consistently sustained the delegation of legislative authority under broad and general statutory standards governing the manner in which administrative agencies must exercise the authority delegated. Thus, against constitutional attacks, we have upheld standards authorizing the Public Advocate to represent the "public interest" in administrative and court proceedings, *Mt. Laurel Township, supra,* 83 *N.J.* 522; requiring the Department of Environmental Protection to use its power to "promote the health, safety, and welfare of the public," *Matter of Egg Harbor Assocs., supra,* 94 *N.J.* 358; directing the State Highway Commissioner to determine what passenger train service "is essential in the public interest," *Sprissler v. Pennsylvania-Reading S.S. Lines,* 45 *N.J.* 127 (1965); empowering the Board of Public Utilities Commissioner to regulate in a manner that will serve "public convenience and necessity," *In re New Jersey & New York R. Co.,* 12 *N.J.* 281 (1953), appeal dismissed, 346 *U.S.* 868, 74 *S.Ct.* 123, 98 *L.Ed.* 378 (1953); and allowing the Commissioner of Banking and Insurance to permit maintenance of a bank's branch office when to do so would be "in the public interest." *Elizabeth Federal S. & L. Ass'n v. Howell,* 30 *N.J.* 190 (1959).

The public interest standard of *N.J.S.A.* 52:34–12(d) is consistent with these decisions and was properly applied by the Director in this case. The first requirement relating to the proper delegation of legislative authority, discussed in *Mt. Laurel Township, supra,* 83 *N.J.* 522, evidences a concern that the agency invested with delegated legislative authority may acquire power that is properly lodged in the Legislature. For that reason, the authority of an administrative agency must be limited and restrained lest the agency arrogate too much governmental power.

In this case, it is suggested that if the "public interest" standard of *N.J.S.A.* 52:34–12(d) were construed to mean or to include the "appearance of wrongdoing," the basic standard

would be so broad as to be illusory. Keyes Martin contends, and the Appellate Division ruled, that allowing the Director the discretion under the "public interest" standard to make decisions concerning bids in terms of his understanding of "public perception" grants him the authority to use the power of his office in an arbitrary and wholly subjective manner. We disagree.

 To determine whether administrative power is sufficiently circumscribed, the language of the statutory standard "may not be judged in a vacuum." *Elizabeth Federal S. & L. Ass'n v. Howell, supra,* 30 *N.J.* at 194. The statutory authority to reject bids when "it is in the public interest so to do," *N.J.S.A.* 52:34-12(d), must be understood in terms of the purpose of the enactment, the general statutory scheme of which it is a part, and the regulatory context in which it is to be applied. These considerations may give concreteness to a standard that may otherwise seem overbroad. "The standard draws specificity from each setting." *Trap Rock Indus., Inc. v. Kohl,* 59 *N.J.* 471, 483 (1971); *see Elizabeth Federal S. & L. Ass'n, supra,* 30 *N.J.* at 194; *see also Motyka v. McCorkle,* 58 *N.J.* 165, 178 (1971) (adequate standard may be implied from presence of procedural and judicial safeguards).

 A major objective of all public bidding statutes has been to promote the honesty and integrity of those bidding and of the system itself.

> Bidding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good. Their objects are to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of unfettered competition. To achieve these purposes all bidding practices which are capable of being used to further corrupt ends or which are likely to affect adversely the bidding process are prohibited, and all awards made or contracts entered into where any such practice may have played a part, will be set aside. This is so even though it is evident that in fact there was no corruption or any actual adverse effect upon the bidding process. [*Terminal Const. Corp. v. Atlantic City Sewerage Auth.,* 67 *N.J.* 403, 409-10 (1975).]

*See Trap Rock Indus., supra,* 59 *N.J.* at 479; *Hillside Township v. Sternin,* 25 *N.J.* 317, 322 (1957); *In re Honeywell Information Systems, Inc., supra,* 145 *N.J.Super.* at 200. To this end, our courts have often set aside an award of a contract when evidence of corruption, inequality, or unfairness was present.

In addition to a consideration of the purpose of the enactment, the standard specified under *N.J.S.A.* 52:34–12(d) must also be viewed in a larger statutory framework. Under *N.J. S.A.* 52:25–6 and *N.J.S.A.* 52:27B–55 the Director of the Division of Purchase and Property has "the exclusive authority and duty to purchase all articles used or needed by the state and its using agencies."[4] The Director is "vested with the powers, duties, and responsibilities involved in the efficient operation of a centralized State purchasing service" and has been given the authority, subject to the approval of the State Treasurer, "to organize the Division for the effective performance of its functions and purposes." *N.J.S.A.* 52:27B–56. Obviously, the purchasing requirements of different using agencies are different. Whenever the Director is called upon to decide which bid from among many is most advantageous to the State, he must consider the specific needs and policies of the using agency as well as the general prescriptions of the public bidding statute. The standard under which he may exercise this multi-faceted authority must be broad enough to allow accomplishment of his various obligations, yet sufficiently narrow to prevent abuse.

It is also relevant to consider the regulatory context in which the bidding laws are to be applied. In this case, the Commission is specifically authorized and directed to promulgate rules governing the operation of the Lottery system "in order that such Lottery shall produce the maximum amount of net revenues for State institutions and State aid for education conso-

---

[4]By virtue of *N.J.S.A.* 52:18A–153, the duty to contract with respect to the construction or repair of public buildings had been transferred to the Division of Building and Construction.

nant with the dignity of the State and the general welfare of the people." *N.J.S.A.* 5:9–7a. In promulgating its rules, the Commission was instructed to rely on the report and recommendation of the State Lottery Planning Commission. *Id.* The Planning Commission's report emphasized two major criteria for the organization and operation of the Lottery:

First, it must, to the greatest extent possible, attract the confidence of the public. As such it must forever be untainted by any suspicion of unethical conduct. In this regard, the Commission strongly recommends that the personnel of the Lottery Division proposed in this report and all persons doing business with the Division be carefully screened through regular security checks. Second, it must be such as to achieve the goals of the lottery operation, as set by collective public opinion, to the fullest extent possible. [Report of the New Jersey Lottery Planning Commission, at p. 4.]

In its discussion of administrative operations, the Planning Commission emphasized that the most important consideration was that the Lottery "command the full trust and confidence of the citizens of this State; in particular, the operation of the Lottery must be free of any possible suspicion of improper conduct." *Id.* at p. 6. The Commission also stressed that the financial success of the Lottery was to a great extent based upon the public's confidence in a Lottery run in an ethical and honest fashion. *Id.* at pp. 20, 25. In the conclusion to its report, the Commissioner stated that the "State must exercise sufficiently tight control over its Lottery so as to ensure full public confidence in its integrity." *Id.* at p. 34.

The Planning Commission's emphasis on public confidence in the ethical and honest operation of the Lottery is further reflected in specific regulations governing the Division of Lottery and the Lottery Commission. The specifications incorporated in the Requests for Proposals, specifically provide that one of the goals of the Lottery is to "continue to maintain and reinforce the credibility and good name of the New Jersey State Lottery." Additionally the Lottery Commission had promulgated a strict Code of Ethics to prevent disreputable or unsavory government activity. These focus specifically on the area of conflicts of interest. Representative provisions state:

No Commissioner shall have any interest, financial or otherwise, direct or indirect, or engage in any business or transaction or professional activity, which is in conflict with the proper discharge of his duties in the public interest. Commissioners who deal with outside organizations on behalf of the Lottery to negotiate the purchase of products, materials, or services, or who are in a position to influence such purchases or awarding of contracts should have no propriety or financial interest either in those furnishing such products, materials, or in any transaction related thereto.

No Commissioner shall use or attempt to use his official position to secure unwarranted privileges or advantages for himself or others.

No Commissioner shall act in his official capacity in any matter wherein he has a direct or indirect personal financial interest that might reasonably be expected to impair his objectivity or independence of judgment.

No Commissioner shall knowingly act in any way that might reasonably be expected to create an impression or suspicion among the public having knowledge of his acts that he may be engaged in conduct violative of his trust as a Lottery Commissioner.5

The bidding specifications and the Code of Ethics thus express a clear regulatory policy that the public perception of the Lottery constitutes an essential dimension in all action taken by the Commission.

█ These considerations lead us to conclude that the public interest standard of the statute is amenable to discrete and restricted applications and that the appearance of impropriety, as an application of the general standard in this case, is itself a sufficiently concrete and limited criterion. It constitutes an adequate guideline to assure that the Director in the performance of his responsibilities under the bidding law is not usurping legislative authority.

█ The second major purpose of limiting standards that control delegated authority, as expressed in *Mt. Laurel Town-*

---

5Subsequent to the Director's award in this case, the Lottery Commission promulgated a Code of Ethics for Vendors and Contractors. One provision of this Code prohibits vendors from "maintain[ing] any business relationship with any person who is a Lottery Commissioner, officer or employee." Although this Code of Ethics was not in effect when the facts of this case arose, its promulgation indicates that the policy of maintaining the public trust and confidence in the Lottery is the same for vendors as it is for commissioners.

*ship, supra,* is to confine an agency's action to the scope of its expertise. In this case the Appellate Division ruled that "[t]he expertise which renders [the Director's] actions proof against judicial intervention relates to matters of business judgment, *In re Honeywell Information Systems, Inc.,* 145 *N.J.Super.* 187, 200 (App.Div.1976), certif. den., 73 *N.J.* 53 (1977), and we cannot conceive that the Legislature intended him to act on the basis of his personal view of what the 'public interest' requires outside the scope of business considerations." 196 *N.J.Super.* at 61.

■ There can be no doubt that when decisions that affect the Lottery Commission are made, the public's perception should, and in some instances must, be considered. As we have said, the business of the Lottery often depends on and is interrelated with what the public believes to be the integrity of the system. As the official ultimately responsible for procuring services for the benefit of the Lottery Commission, the Director must develop his expertise in all areas of the Lottery that will be affected by his decisions. In this case, his decision to award the Lottery advertising contract fairly demands consideration of appearances that might lead to a loss of public confidence in the Lottery. To confine the Director's considerations solely to "matters of business judgment" would impose a myopic perspective on his responsibilities that could well warp his decisions. The factors that might contribute to a loss or decline in public confidence are not so theoretic or esoteric as to be outside the realm of the Director's expertise. Therefore, allowing the Director to reject Keyes Martin's bid based on its potential impact on the public does not offend the precept that an agency must act only within its area of expertise. The appearances standard is not deficient in this respect.

Nor is this standard deficient with respect to the third purpose discussed in *Mt. Laurel Township, supra,* for limiting the delegation of legislative authority. A standard under which an administrative agency acts must facilitate judicial review in order to "guard against arbitrary and capricious government

action." *Mt. Laurel Township, supra,* 83 *N.J.* at 532–33. A majority of the Appellate Division felt in this case that the Director's "chosen standard is beyond the reach of meaningful appellate review. No one but the Director can know precisely what was decided and why." 196 *N.J.Super.* at 62. It was the view of the lower court that government decisions should not be based on "hunches" as to what the public might perceive.

 If it were true that under this standard the Director was free to reject low bids based on an irresponsible, unarticulated feeling that the public interest would be best served by doing so, we would not hesitate to invalidate the standard and any decision made under it. However, such is not the case. A requirement of reasonableness is necessarily and sensibly engrafted onto the standard. An appellate court may reverse an arbitrary decision. *See R.H. Macy & Co. Inc. v. Director, Div. of Taxation,* 77 *N.J.Super.* 155, 178 (App.Div.1962), aff'd o.b., 41 *N.J.* 3 (1963) (statute providing for determination "in the opinion of the Director" construed to require "reasonable judgment of an administrator making an objective judgment of the matter"); *see also Maietta v. N.J. Racing Comm'n,* 183 *N.J. Super.* 397 (App.Div.1982), aff'd, 93 *N.J.* 1 (1983) (statute that authorizes refusal to issue a license if "in the opinion of the [Racing] Commission * * * the refusal is in the public interest" does not permit such discretion to be exercised "arbitrarily").

Further protection is afforded by the presence of an adequate record on review. In making his decision in this case, the Director relied on a comprehensive report of the hearing officer as well as the recommendations of the Attorney General and the Lottery Commission. All the allegations and replies concerning conflicts of interest were before him. His decision was based on a complete record and a full documentation of the factual setting. The needs for adequate judicial review have been amply met in this case.

 We are satisfied that the Director did not abuse his discretion in awarding the Lottery advertising contract to an

agency other than Keyes Martin. It was proper to consider the fact that a business relationship existed between Reese Palley and Keyes Martin, as well as any other facts that may have colored the public's perception regarding the integrity of the lottery system. The Director could conclude from the record that the public might have perceived Reese Palley's relationship with Keyes Martin as one involving special treatment, which could reflect adversely on the integrity of the Lottery Commission and impair the public's confidence in the Lottery.

In conclusion, we hold that the statutory standard authorizing the rejection by the Director of bids for public work "in the public interest" provides a sufficiently definite framework within which to exercise administrative power. We hold further that this standard was properly applied on an adequate factual record by the Director to reject a bid based on the appearance of wrongdoing attributable to a possible conflict of interest involving the bidder and a member of the contracting agency. Accordingly, we rule that the Director properly exercised his discretion in determining that the public perception of Keyes Martin's business relationship with Reese Palley justified rejection of that agency's bid.

### III.

In his dissent below, Judge Brody concluded that there may have been sufficient evidence of an impermissible relationship between Palley and Gaby but in rejecting Keyes Martin's bid, the Director followed an incorrect procedure. According to the dissent, when a dispute arises as to the moral integrity of a bidder, including, as alleged here, a conflict of interest, the Director should comply with the procedure for debarment or suspension of a bidder, as set forth in *N.J.A.C.* 17:12–7.1 to 17:12–7.11. Accordingly, Judge Brody would have remanded the case, instructing the Director to abide by those procedures.

Administrative regulations set forth a detailed system under which the Division of Purchase and Property may debar or

suspend a person or company. Both debarment and suspension involve the exclusion of the party from contracting with the Division. A suspension is an exclusion for a temporary period of time pending the completion of an investigation, while a debarment is an exclusion for an amount of time determined in accordance with the seriousness of the underlying wrongdoing. *N.J.A.C.* 17:12–7.1.

The causes for debarment and suspension are listed in *N.J. A.C.* 7:12–7.2. They include numerous serious offenses and statutory violations. The only arguably applicable provision appears in paragraph 12: A party shall be debarred or suspended due to "[a]ny other cause affecting responsibility as a state contractor of such serious and compelling nature as may be determined by purchase and property to warrant debarment * * *." In order to support a debarment, the existence of any such cause must be established by clear and convincing evidence. *N.J.A.C.* 17:12–7.3(a)5. In contrast, a suspension must be based on "adequate evidence that cause exists or upon evidence adequate to create a reasonable suspicion that cause exists." *N.J.A.C.* 17:12–7.6(a)3. Judge Brody found that the Director could have had a reasonable suspicion that Keyes Martin engaged in conduct that would have affected its responsibility as a state contractor and therefore could have suspended Keyes Martin pending the completion of an investigation. ·He felt that if suspicion existed such as would have warranted suspension, the Director was required to proceed in accordance with the notice and hearing requirements of *N.J.A.C.* 17:12–7.7.

█ For a number of reasons, we hold that under the circumstances of this case, the Director was not obligated to initiate debarment or suspension proceedings and acted properly in refusing to award the advertising contract to Keyes Martin. First, the Director did not base his award on suspicions of serious misconduct on the part of Keyes Martin that would affect its responsibility as a State contractor. A lack of a moral responsibility may disqualify a bidder, *Trap Rock*

*Indus., supra,* 59 *N.J.* 471, but no such contention or suggestion with respect to Keyes Martin is present in this case. Rather, the Director's decision was permissibly based on the adverse public impression that an award to Keyes Martin would have fostered. In fact, Keyes Martin was never found to have actually engaged in any wrongdoing. In his final decision, the Director specifically ruled that "Keyes Martin is not precluded from bidding on future non-Lottery State contracts, or, further, from bidding on future Lottery contracts when there is no member having a business relationship with the vendor." Thus, it is clear that the Director did not consider Keyes Martin's conduct to be sufficiently serious in nature to require imposition of the sanctions allowed under the regulation.

Moreover, the debarment and suspension regulations explicitly confirm the Director's ability to refuse to award a contract to a party in these circumstances. *N.J.A.C.* 17:12–7.11 provides that "[n]othing contained herein shall be construed to limit the authority of the Director of Purchase and Property to refrain from contracting within the discretion allowed by law." We take this to mean that in a given bidding situation, the power of the Director to determine, considering the public interest, whose bid will be most advantageous to the State is independent of the requirements under the debarment and suspension regulations. In this case the evaluated conduct of Keyes Martin permitted a rejection of its bid but did not require the initiation of debarment or suspension proceedings.

Additionally, we note that under *N.J.A.C.* 17:12–3.1 a bidder protesting an award by the Director is entitled to an informal hearing conducted by the Division. Keyes Martin requested and was granted exactly that. When a bid is rejected based on grounds or for reasons that are similar to those that could, under other circumstances, support debarment or suspension, the procedures followed must generate the same assurance that the public interest has been met as attends the conduct of debarment and suspension proceedings. It is clear

from the record in this case that the public interest was preserved and that Keyes Martin was accorded administrative due process in terms of a full and fair hearing at the agency level. *See Commercial Cleaning Corp. v. Sullivan, supra,* 47 *N.J.* at 550.

## IV.

For the reasons set forth in the opinion, we reverse the judgment below and reinstate the final determination of the Director.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK and GARIBALDI—5.

*For affirmance*—None.