833 A.2d 84

SEACOAST BUILDERS CORPORATION, PLAINTIFF–RESPONDENT, v. JACKSON TOWNSHIP BOARD OF EDUCATION, DEFENDANT–APPELLANT, AND ART ANDERSON, INC., DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued September 30, 2003—Decided October 21, 2003.

374

Before Judges PRESSLER, PARKER and COLEMAN.

*Stephen J. Edelstein* argued the cause for appellant (*Schwartz Simon Edelstein Celso & Kessler,* attorneys; *Lawrence S. Schwartz,* of counsel; *Mr. Edelstein, Stefani C. Schwartz and Christopher R. Welgos,* on the brief).

*Joseph A. Battipaglia* argued the cause for respondent (*Duane Morris, LLP,* attorneys; *Mr. Battipaglia,* on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

Defendant Jackson Township Board of Education appeals from a judgment of the trial court vacating its award to the low bidder, defendant Art Anderson, Inc. (AAI), of a contract for the construction of a new high school building and giving the Board the option of rebidding. We accelerated the appeal and now reverse.

This appeal raises a novel question respecting the financial qualifications for bidders for governmental contracts. More specifically, prospective bidders for public work are required to be preclassified by the Division of Property Management and Construction (DPMC) in the Department of the Treasury in accordance with the provisions of *N.J.A.C.* 17:19–2.1 to –2.7. *See also N.J.S.A.* 18:18A–27. Each classified bidder's aggregate rating must then be calculated in accordance with the formula prescribed by *N.J.A.C.* 17:19–2.8. The aggregate rating, which is based on a variety of financial factors, including the bidder's working capital, bonding capacity, and performance rating, determines the amount of the proposed contract on which it may bid. *N.J.A.C.* 17:19–2.8. At the conclusion of the classification process DPMC issues the bidder a notice of classification which includes the maximum amount of public work on which it is qualified to bid. The issues here presented are first, whether the bidder's aggregate rating is to be determined as of the date of the bid or the date of the award of the contract and second, whether, if the specifications include alternates, the aggregate rating is required to be based on the bidder's base bid or on the bid including all the alternates. The trial judge concluded that the aggregate rating is to be determined as of the bid date and must be based on all alternates in the specifications. We have a somewhat different view of the matter.

The factual context in which the issues are raised is undisputed. The Board solicited bids for the general construction of a new high school asking for both a base bid and a bid on each of fifty-two alternates. Which, if any, of the alternates would be required was a matter of the Board's discretion to be exercised at the time of contract award. AAI was the apparent low bidder having submit-

ted a base bid of $28,748,800 and an aggregate bid of $6,598,600 for the alternates. Plaintiff Seacoast Builders Corporation was the second low bidder, submitting a base bid of $30,285,000 and an aggregate bid for the alternates of about $10,000,000. The Board ultimately decided to require seven of the alternates, for which AAI's aggregate bid was $942,000, which, when added to the base bid, yielded a total bid of $29,690,800, still less than Seacoast's base bid. The Board determined, then, to award the general construction contract to AAI.

Seacoast protested the bid award to AAI urging that AAI's bid exceeded its aggregate rating and hence that it was not qualified to bid on the work. These are the facts on which Seacoast relied. AAI's aggregate rating was for work up to $45,000,000. Its bid documents included a certificate attesting that it had uncompleted contract work of a value of $15,188,000. *N.J.A.C.* 17:19–2.13 generally requires that the value of uncompleted work be deducted from the bidder's aggregate rating in determining its qualification to bid on a specific contract. AAI's aggregate rating of $45,000,000 less its outstanding work of $15,188,000 qualified it to bid no more than $29,812,000. Both AAI's base bid and the amount of the actual contract award, which included seven of the alternates, were within this limitation. Its base bid plus the fifty-two alternates on which it was originally required to bid was beyond this limit. Thus the issues are squarely presented. Does *N.J.A.C.* 17:19–2.13 require the aggregate rating to be determined as of the date of the bid or the date of contract award and does it take into account specified alternates rather than the alternates actually chosen and included in the contract?

The Board disallowed the protest, concluding that AAI was qualified to bid. Seacoast then brought this action in lieu of prerogative writs by verified complaint, and following the submission of certifications and a brief bench trial, the court concluded, by written opinion, that AAI was disqualified pursuant to the terms of *N.J.A.C.* 17:19–2.13 because its original bid including the

fifty-two alternates exceeded its aggregate rating less the value of uncompleted work. The Board appealed.

*N.J.A.C.* 17:19–2.13 provides, in pertinent part, as follows:

(a) A firm shall include with each bid a statement of the current value and status of its backlog of uncompleted construction work (not to include "non-at-risk" construction management contracts) as of the bid due date and a certification that the award of the subject contract would not cause the firm to exceed its aggregate rating.

\* \* \*

(c) A firm shall not be awarded a contract which, when added to its backlog of uncompleted construction work, as shown on Form DPMC 701, would exceed the firm's aggregate rating....

The Board focuses exclusively on paragraph (c) to urge that it is the contract award date that controls. Seacoast argues that paragraph (a) controls. In our view, both paragraphs must be complied with. That is to say, we think it plain that the bidder must include with its bid the required certification that the bid does not exceed its aggregate rating less uncompleted work and that that condition must also be met at the time of the bid award. We think it clear that a bidder's financial situation may change during the period between submitting the bid and the contract award. For example, new contracts may be entered into during that period that may affect aggregate rating. We are satisfied, therefore, that the plain intent of the regulation was to insure the bidder's financial responsibility to undertake the work by requiring aggregate-rating compliance both when the bid is submitted and when the contract is awarded.

That rather obvious conclusion does not, however, answer the question of the contract amount on which the aggregate rating is to be calculated when, as here, alternates are called for. Seacoast argues that the contract amount must include the bid on all alternatives, and the Board argues that it is the amount of the contract actually to be entered into based on the alternates actually chosen that governs. We agree with the trial judge that there is neither textual aid nor agency practical construction that assists in the interpretation of the regulation when alternates are

involved, that the regulation is ambiguous in this regard, and, therefore, that the key to decision lies in the public policy underlying public bidding for government contracts. The judge concluded that public policy supported Seacoast's position.

In addressing the purpose of public bidding laws, the trial judge began with the proposition that their objectives "are to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of unfettered competition. To achieve these purposes all bidding practices which are capable of being used to further corrupt ends or which are likely to affect adversely the bidding process are prohibited . . . ." *Terminal Const. Corp. v. Atlantic Cty. Sewerage Auth.,* 67 *N.J.* 403, 410, 341 *A.*2d 327 (1975).

As we understand the basis of the trial court's ruling, it seems to have relied most heavily on what it saw as opportunities for manipulation if the bidder's aggregate rating at the time of bid submission was based on the base bid rather than the bid with all alternates. Thus the court foresaw the possibility that a bidder whose aggregate rating would be exceeded if some or all the specified alternatives were required would be able to opt out of a contractual commitment once all the bids were exposed if it could bid on the base bid alone. As the judge expressed it, ". . . an inequality . . . [would be] created since the bidder would not be obligated to perform the work." We regard that possibility for bidder manipulation remote since the bidder would be required to perform if the alternatives actually chosen, a matter entirely beyond its control, placed the bid within its aggregate rating. Moreover, there does not appear to be any advantage to a bidder submitting a bid, a costly and time-consuming process, if it does not wish to perform the contract. We see no reason why a bidder whose aggregate rating is within its base bid should not be permitted to take the risk that the chosen alternatives will result in exceeding its aggregate rating. The point is that if all bidders are free to take that risk, the playing field stays level.

As we view the matter, whatever manipulation may be possible is inherent in the nature of specifying alternates in the first place, a practice which is nevertheless accepted as a customary aspect of bidding. That is to say, it is clear that a public entity can favor a bidder by its choice of contractual alternates, and this, of course, without reference to the aggregating-rating issue. Thus, it appears to us that the type of potential manipulation envisioned by the trial judge is insufficiently substantial to outweigh what we perceive to be the other objectives of public bidding.

As our cases have made abundantly clear, of at least equal importance to avoiding corruption and favoritism are the objectives of encouraging free and open competition on a level playing field and securing for the public the performance of the work by the lowest responsible bidder. *See, e.g., Meadowbrook Carting Co., Inc. v. Borough of Island Heights,* 138 *N.J.* 307, 313, 650 *A.*2d 748 (1994); *Keyes Martin & Co. v. Director, Div. of Purchase and Property,* 99 *N.J.* 244, 256, 491 *A.*2d 1236 (1985); *Hillside Twp. v. Sternin,* 25 *N.J.* 317, 322–324, 136 *A.*2d 265 (1957). We are satisfied that the trial court's construction of the regulation has a greater capacity for compromise of these objectives than for preventing corruption and favoritism. With respect to the encouragement of competition, the counting of all the alternates against the bidder's aggregate rating at the time the bid is submitted has the capacity of reducing the field of qualified bidders. We regard this result as unduly restrictive of competition if, based on the alternates ultimately included in the contract, the bidders disqualified from bidding would nevertheless have qualified for an award of the contract. That result is, of course, even more unfortunate when the disqualified bidder would also have been the lowest responsible bidder as of the time of the award. Moreover, a public entity has it in its power to so limit the field of competition by specifying alternates it has no real intention of ultimately requiring, the other side of the coin of the manipulation the trial court was concerned about.

The point we make is that when alternates are included in the specifications, the value of the contract that will ultimately be awarded is unknown. We take the view that disqualifying bidders on the basis of unknown factors is antithetical to the public policy embodied by the public bidding laws. As we see it, where the specifications call for discretionary alternates, the totality of concerns underlying the public bidding laws is best accommodated, consistent with the regulation, by permitting a prospective bidder to submit his bid if the base bid comports with its aggregate rating. That would comply with paragraph (a) of the regulation. When the contract is finally awarded after such alternates as are desired are actually chosen, then the low bidder's aggregate-rating compliance would be measured by the actual contract value. That would satisfy paragraph (c) of the regulation. While clearly the aggregate-rating requirement must be satisfied both at the time of the submission of the bid and the time of the contract award, there is no necessity that the value determining compliance with the aggregate rating be the same both times. We are persuaded that the technique of determining aggregate-rating compliance at the time of the bid based on the base bid and then determining it at the time of the award based on the actual contract value best serves the public interest in the enforcement of the policies and objectives of the public bidding laws. Because AAI's base bid was within its aggregate rating and because the value of the contract actually awarded was also within its aggregate rating, we are satisfied that the Board had the authority to award it the contract as the lowest responsible bidder. Accordingly, we reverse the judgment appealed from.

Seacoast, in its answering brief, also argues that the trial court erred in permitting the Board to rebid rather than awarding the contract to it as the lowest qualified bidder. It did not, however, cross appeal from that ruling, and hence it is not properly before us. *See, e.g., Marjarum v. Township of Hamilton,* 336 *N.J.Super.* 85, 101, 763 *A.*2d 796 (App.Div.2000); *Semexant v. MIL Ltd.,* 252 *N.J.Super.* 318, 322–323, 599 *A.*2d 935

(App.Div.1991). Beyond that, the argument is rendered moot by our disposition in favor of the Board.

The judgment appealed from is reversed and we remand for entry of judgment in favor of the defendant Jackson Township Board of Education authorizing its contract award to defendant Art Anderson, Inc.