ALFRED SPRISSLER, *ET AL.*, PLAINTIFFS-APPELLANTS, v.
THE PENNSYLVANIA-READING SEASHORE LINES, *ET
AL.*, DEFENDANTS-RESPONDENTS.

Argued May 4, 1965—Decided June 28, 1965.

130

*Mr. James M. Davis, Jr.* argued the cause for appellants (*Messrs. Powell & Davis,* attorneys).

*Mr. Blaine E. Capehart* argued the cause for respondent Pennsylvania-Reading Seashore Lines (*Messrs. Capehart & Scatchard,* attorneys).

*Mr. Alan B. Handler,* First Assistant Attorney General, argued the cause for respondent Highway Commissioner (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney; *Mr. Avrom J. Gold,* Deputy Attorney General, of counsel and on the brief).

PER CURIAM. The State Highway Commissioner, after conducting hearings, decided that the Pennsylvania-Reading Seashore Lines should be permitted to discontinue its trains numbered 609 and 610 between Camden and Clementon and its trains numbered 754 and 775 between Camden and Millville. An appeal to the Appellate Division was taken from this decision by Alfred Sprissler and three unions, namely, the Brotherhood of Railroad Trainmen, the Brotherhood of Locomotive Firemen and Enginemen and the Brotherhood of Locomotive Engineers. See *R. R.* 4:88–8. We certified before argument in the Appellate Division. See *R. R.* 1:10–1(a).

In 1959 the Legislature created a Division of Railroad Transportation in the State Highway Department and directed that it engage in a continuous study of commuter and passenger railroad operations throughout the State with the end in view of seeking solutions to our mounting transportation problems. *L.* 1959, *c.* 14; *N. J. S. A.* 27:24–1 *et seq.* The Division submitted a report in April 1960 and this was followed by the enactment of Chapter 66 of the *Laws of* 1960. *N. J. S. A.* 48:12A–1 *et seq.* That statute empowered the

Highway Commissioner to enter into contracts with railroad carriers for the operation of approved passenger service and provided for payments by the State to the carriers at the rates set forth in the contracts, subject to the terms of the legislation. Under section 10 every carrier entering into a contract was obliged to continue all passenger service during the term of the contract but the Commissioner was empowered, after 6 months, to re-evaluate the non-approved service and determine what part of that service "can and should reasonably be required of the railroad during the remaining term of the contract." The same section directed that "[a]ny action taken pursuant to such a determination shall be for the duration of the contract only unless by future contracts or determinations, the rights and obligations are extended."

In 1962, Chapter 66 was supplemented to authorize the Commissioner to undertake improvements to capital facilities in order to protect the State's investment in highway construction, to coordinate with interstate transportation improvements, and to achieve greater efficiency in rail passenger operations. *L.* 1962, *c.* 191; *N. J. S. A.* 48:12A–17 *et seq.* Section 3 of this act authorized the Commissioner to require, as a condition of the State's entering into a contract relating to improvements to capital facilities, that the carrier also execute a contract to provide approved passenger service under Chapter 66 "for such period of time as the commissioner shall determine shall be in the public interest."

In 1964 the Legislature enacted Chapter 58 which was apparently designed to clarify the extent of the powers vested in the Commissioner by the earlier legislation; it expressly provided that the Highway Commissioner, upon entering into a contract for passenger service pursuant to Chapter 66, could, without approval of the Board of Public Utility Commissioners, "authorize a discontinuance, curtailment, abandonment or change in passenger service, which discontinuance, curtailment, abandonment or change in service shall exist only during the term of said contract." *L.* 1964, *c.* 58; *N. J. S. A.* 48:2–24. Chapter 58 also ratified any earlier discontinuances,

curtailments, abandonments or changes authorized by the Highway Commissioner without approval of the Board of Public Utility Commissioners. *N. J. S. A.* 48:2–24.1.

Shortly after Chapter 58 was enacted, the Legislature passed Chapter 88 which sets forth the current powers of the State Highway Commissioner with respect to contracts with carriers for continued operation of passenger service. *L.* 1964, *c.* 88; *N. J. S. A.* 48:12A–16.1 *et seq.* Section 9 of this act provides that the contracting carrier may petition for changes in passenger service and where the petition involves "a decrease in the number of trains" the Commissioner shall hold a hearing on notice. Section 16 repeals Chapter 66 but provides that the repealer shall not in any way affect any contracts, determinations or orders by the Commissioner pursuant to the authority theretofore granted but such contracts, determinations and orders "shall continue with full force and effect until otherwise amended, repealed or terminated in accordance with the terms thereof or pursuant to the provisions of this act."

The Pennsylvania-Reading Seashore Lines, which had entered into a contract with the Highway Commissioner for the fiscal year July 1, 1963 to June 30, 1964, duly applied for permission to discontinue its trains numbered 609 and 610 operating between Clementon and Camden and trains numbered 754 and 775 operating between Millville and Camden. Hearings on its application were held during February 1964. (These hearings also dealt with an application to discontinue trains numbered 1011, 1026 and 1038 operating between Atlantic City and Philadelphia; that application was ultimately denied by the Commissioner, no appeal was taken from the denial and it is not now before us.) The evidence presented during the hearings sufficiently established that the Clementon-Camden and Millville-Camden runs were being operated by the carrier at substantial loss, that the very limited number of passengers who used the runs had dropped since 1961, and that reasonable alternate means of transportation *via* buses were available to them.

■ In granting the application, the Commissioner pointed out that the cheaper rides, the direct routes to Philadelphia, and the multiplicity of schedules had made bus service the general choice of the public transportation travelers in the area; that those who still continued to use the railroad did so because of individual preference rather than necessity; and that "in providing service on the Clementon line and on these two trains on the Millville line, the railroad is in effect subsidizing a particular travel pattern for a small segment of commuters without any real hope of their obtaining sufficient revenue to meet expenses." The Commissioner expressed the opinion that the railroad's need for relief was clear and that his ruling "makes a practical application of the 'balanced' transportation principle by giving the responsibility for the carriage of passengers to the carrier which has proven itself to be most efficient and which is already the travel choice of the overwhelming preponderance of commuters in this area." Although the appellants attack several evidential rulings made during the hearings, it is clear to us that those rulings were not at all prejudicial; and we are satisfied that the totality of the evidence before the Commissioner furnished reasonable basis for his decision. See *In re Del., Lackawanna & Western R. R. Co.,* 25 *N. J.* 353, 356 (1957); *In re Greenville Bus Co.,* 17 *N. J.* 131, 137 (1954); see also *In re Central Railroad Co. of N. J.,* 29 *N. J. Super.* 32 (*App. Div.* 1953).

■ The appellants do not attack the legislative enactments as authorizing an improper appropriation of money by the State in violation of *Article* VIII, § III, *par.* 3 or related constitutional provisions; at oral argument their counsel stated that his clients, particularly the unions, had specifically instructed him that no such attack be made. However, the appellants do advance several legal contentions addressed to the Commissioner's action and they will be dealt with here. Their first contention is that Chapter 58 of the Laws of 1964 violates *Article* V, § IV, *par.* 1 of the New Jersey Constitution which provides that all executive departments "shall be

134

allocated by law among and within not more than twenty principal departments, in such manner as to group the same according to major purposes so far as practicable." In effect, the appellants contend that the power to authorize the discontinuance of trains has been vested in the Board of Public Utility Commissioners and may not constitutionally be vested in the Highway Commissioner even to the limited extent provided by Chapter 58. We consider this contention to be wholly without foundation.

Before our current Constitution was adopted, there had developed a pattern of establishing independent administrative agencies to perform newly created functions. At the time the delegates to the Constitutional Convention met in 1947 there were over 70 such agencies. To increase governmental efficiency it was decided that there should be not more than 20 principal departments within which all executive and administrative agencies were to be allocated by the Legislature "according to major purposes so far as practicable." This quoted language deliberately left a reasonable measure of flexibility within which the Legislature could act from time to time to meet public needs.

The fact that the Legislature established the Department of Public Utilities as one of the principal departments (*L.* 1948, *c.* 90, *N. J. S. A.* 48 :2–1 *et seq.*) with comprehensive power to deal with railroads did not preclude later action by the Legislature vesting, in another principal department, certain powers which affected railroads but were reasonably related to the major functions of such other department. Thus when the Legislature was confronted with urgent mass transit problems it realized that solution would necessitate joint consideration of both highway and rail travel. Reductions in commuter railway service would increase highway traffic and entail substantial highway expenditures; and coordination of highway construction with commuter rail service would involve consideration of what particular railway services were required and what services could be discontinued as not essential in the public interest. In determining what

agency should deal with the over-all problems the Highway Commissioner was a natural choice and in making it the Legislature violated neither the letter nor the purpose of *Article* V, § IV, *par.* 1.

██ The appellants next contend that Chapter 58 "contains no standards by which the Commissioner shall be governed in authorizing the discontinuance of a passenger train" and is therefore unconstitutional under *Article* III, *par.* 1 which provides that the powers of the government shall be divided among three distinct branches and that no person in one branch shall exercise powers belonging in another branch, except as expressly authorized in the Constitution. Chapter 58 must, of course, be read in the light of Chapter 66 and, as thus read, there are clearly adequate standards. See *Ward v. Scott*, 11 *N. J.* 117, 122–125 (1952) ; *In re Berardi*, 23 *N. J.* 485, 491 (1957) ; *Roe v. Kervick*, 42 *N. J.* 191, 231–232 (1964). Section 10 of Chapter 66 empowered the Commissioner to re-evaluate the non-approved service and determine what part should reasonably be required of the railroad during the remaining term of the contract; in making his re-evaluation and determination the Commissioner was directed to hold a hearing on notice and to take into account, "in addition to those factors specified in section 3," the service which the carrier has rendered in the public interest under the terms of the contract.

[6] In section 3, the Legislature directed that the Commissioner annually investigate and determine what passenger service "is essential in the public interest"; and it also enumerated factors to be taken into account by the Commissioner in addition to whatever other circumstances he believed to be "just and reasonable." In section 14 the Legislature stated that the act was intended "to protect and promote the public health, safety and welfare" and was to be liberally construed to effectuate its objective. It is true, as the appellants point out, that nowhere in the act did the Legislature use the literal phrase "public convenience and necessity" but that can be of no significance here for the Legislature did use other general

language, hereinabove quoted, which at least in the present context has much the same design and meaning. See 1 *Davis, Administrative Law* §§ 2.03, 2.04 (1958). In *Susquehanna, etc. Ass'n v. Bd. of Pub. Util. Comm'rs.*, 55 *N. J. Super.* 377, 392 (*App. Div.* 1959), the court stated that, when passing on questions of public convenience and necessity, the major factors are (1) the cost of providing the service, (2) the local need, and (3) the availability and adequacy of alternate transportation facilities. It is to be noted that here the Commissioner, guided by the general standards of public interest and public health, safety and welfare, dealt with these very factors in arriving at his determination that the Pennsylvania-Reading Seashore Lines should be permitted to discontinue its trains numbered 609 and 610 between Camden and Clementon and its trains numbered 754 and 775 between Camden and Millville.

The appellants contend that Chapter 58 impairs the obligation of contracts in violation of *Article* IV, § VII, *par.* 3 of the New Jersey Constitution and *Article* I, § X, cl. 1 of the United States Constitution. Their point is that the railroad has contractual obligations arising out of its charter, that these belong to our citizens and the users of the service, and that to the extent that Chapter 58 empowers the Commissioner to permit the discontinuance of the service it impairs the obligation of the carrier's contract. It may be doubted that the appellants, who are not parties to the contract, are in any position to assert its impairment; in any event we consider their point to be entirely without basis. In *Penna.-Reading S. S. Lines v. Bd. of Pub. Utility Com'rs.*, 5 *N. J.* 114, *cert.* denied 340 *U. S.* 876, 71 *S. Ct.* 122, 95 *L. Ed.* 637 (1950), this Court recognized that the Legislature had constitutionally empowered the Board of Public Utility Commissioners to authorize a railroad to discontinue the operation of a train when public convenience and necessity no longer required its service. Here a limited power of like nature under standards which were comparable, at least when viewed in the present context, was later vested by the Legislature in the

Highway Commissioner; within the doctrines fully expounded in *Penna.-Reading S. S. Lines v. Bd. of Pub. Utility Com'rs., supra,* such vesting presents no constitutional problems under the impairment clause.

█ █ Finally, the appellants contend that Chapter 58 violates the Fourteenth Amendment to the United States Constitution by providing that any discontinuance authorized by the Commissioner shall exist only during the term of the contract. The Commissioner has properly construed this provision to mean that the discontinuance will relate to the term of the contract and its renewals. See *L.* 1960, *c.* 66, § 10; *N. J. S. A.* 48:12A–10; *L.* 1964, *c.* 88, § 9; *N. J. S. A.* 48:12A–16.9. The appellants suggest that if, at the end of the last renewal, the railroad is required to reinstate the discontinued trains irrespective of public convenience and necessity, there will be a deprivation of the railroad's property without due process of law. But the railroad expressly disavows any such contention and the appellants, who could not be harmed by a later reinstatement of service, have no standing to assert it on its behalf. See *Mountain Lakes Bd. of Education v. Maas,* 56 *N. J. Super.* 245, 259 (*App. Div.* 1959), aff'd 31 *N. J.* 537, *cert.* denied 363 *U. S.* 843, 80 *S. Ct.* 1613, 4 *L. Ed. 2d* 1727 (1960); *cf. Ahto v. Weaver,* 39 *N. J.* 418, 427–428 (1963); *State v. Monteleone,* 36 *N. J.* 93, 100 (1961).

Affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For reversal*—None.