622 A.2d 843

JANE BRADY, A NEW JERSEY RESIDENT, PETITIONER–APPEL-
LANT, v. THE NEW JERSEY REDISTRICTING COMMISSION
AND DANIEL J. DALTON, SECRETARY OF STATE OF THE
STATE OF NEW JERSEY, RESPONDENTS–RESPONDENTS.

———

SAVE OUR SHORE DISTRICT, PLAINTIFF–APPELLANT, v. THE
NEW JERSEY REDISTRICTING COMMISSION; JAMES J. FLO-
RIO, GOVERNOR OF THE STATE OF NEW JERSEY; AND
DANIEL J. DALTON, SECRETARY OF STATE OF THE STATE
OF NEW JERSEY, DEFENDANTS–RESPONDENTS.

Argued April 6, 1992—Decided April 7, 1992.

596

598

*Brian J. Molloy* argued the cause for appellant Jane Brady (*Wilentz, Goldman & Spitzer,* attorneys; *Mr. Molloy* and *John A. Hoffman,* of counsel; *Mr. Molloy, Mr. Hoffman, Robert J. Curley, Yvonne Marcuse, Richard A. Catalina, James A. Robertson* and *Charles J. Sgro,* on the briefs).

*Eugene M. LaVergne* argued the cause for appellant Save Our Shore District (*Chamlin, Rosen, Cavanagh & Uliano,* attorneys; *Mr. LaVergne* and *Steven M. Levine,* a member of the District of Columbia bar, of counsel and on the briefs).

*Edward J. Dauber,* Executive Assistant Attorney General, argued the cause for respondents (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Mr. Dauber, Alfred E. Ramey* and *Jack M. Sabatino,* Assistant Attorneys General, of counsel; *Mr. Sabatino, Susan L. Reisner* and *David Dembe,* Senior Deputy Attorneys General, and *Christopher Leavey,* Deputy Attorney General, on the briefs).

*Michael R. Cole* argued the cause for Republican members of respondent New Jersey Redistricting Commission (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Mr. Cole* and *John P. Sheridan, Jr.,* of counsel; *Mr. Cole, Mr. Sheridan, Mark W. Musser,* and *Barbara Laczynski,* on the briefs).

The opinion of the Court was delivered by

CLIFFORD, J.

Plaintiffs in these two proceedings mounted challenges to the Congressional-reapportionment plan that the New Jersey Redistricting Commission (hereinafter "Redistricting Commission" or "Commission") designed in March 1992. Following argument of their appeals in this Court on April 6, 1992, we issued an order on the following day, in view of the need for expeditious resolution of the issues. That order announced our decision upholding the plan and set forth our conclusions that (1) the Legislature had the power to delegate to the Redistricting Commission the duty to develop a redistricting plan, and (2) plaintiffs had failed to demonstrate that the Commission's plan did not satisfy the applicable statutory criteria. This opinion sets forth the reasoning that supports those conclusions.

## I

As a result of population shifts revealed by the 1990 census New Jersey lost one Congressional seat, reducing the State's

contingent in the United States House of Representatives from fourteen to thirteen until the year 2000. That circumstance required that New Jersey redraw district lines to redistribute the state's population into thirteen Congressional districts.

The State Legislature's two previous attempts to fashion Congressional-redistricting plans following the 1970 and the 1980 censuses had resulted in federal-court rulings on the validity of the redistricting plans for those decades. See *Daggett v. Kimmelman*, 535 *F.Supp.* 978 (D.N.J.1982), *aff'd*, 462 *U.S.* 725, 103 *S.Ct.* 2653, 77 *L.Ed.*2d 133 (1983), *remanded*, 580 *F.Supp.* 1259 (D.N.J.), *aff'd*, 467 *U.S.* 1222, 104 *S.Ct.* 2672, 81 *L.Ed.*2d 869 (1984); *David v. Cahill*, 342 *F.Supp.* 463 (D.N.J. 1972). The likelihood of a bitter battle, confusion, and partisan discord regarding the plan for the current decade appeared almost certain, given the reversal of fortunes of the two major political parties in the November 1991 election.

Although the Democrats had controlled both houses in the State Legislature, the Republican party won veto-proof majorities in both houses in the 1991 elections. In January 1992 the composition of the State Legislature would change drastically. Conceivably, the Democratic majority could have passed, during the "lame-duck" period, a plan favorable to the Democratic interests—a plan that certainly would have been replaced by a plan more favorable to Republican interests when the new Republican majorities assumed their seats at the outset of the next legislative session. The two parties, aware of the controversies surrounding the two previous redistricting plans and wishing to contain, if not avoid altogether, the discord that had surfaced in those earlier efforts, agreed on a new approach to devising the next redistricting plan: they would create a commission composed of an equal number of representatives from each party and one "independent" member chosen by the partisan participants.

In keeping with that arrangement the Legislature passed a law (the Act) creating the Redistricting Commission. See

*L.*1991, *c.* 510; *N.J.S.A.* 19:46–6 to –14. The Act allows each party to appoint six commissioners. *N.J.S.A.* 19:46–7(b). Those twelve partisan commissioners then select one independent member to serve as chairman of the Commission, *N.J.S.A.* 19:46–7(c), and to vote only if the vote of the other commissioners produces a tie, *N.J.S.A.* 19:46–9. To ensure that the plan receives public input, the Act contains the following requirements:

> Meetings of the New Jersey Redistricting Commission shall be held at convenient times and locations. The Commission shall hold at least three public hearings in different parts of the State. The Commission shall, subject to the constraints of time and convenience, review written plans for the establishment of Congressional districts submitted by members of the general public.
>
> [*N.J.S.A.* 19:46–11.]

However, the Act exempts the Commission from the requirements of the Open Public Meetings Act. *Ibid.*

The Act provides guidelines to enable the Commission to craft a plan that satisfies federal- and state-constitutional and statutory guidelines. *N.J.S.A.* 19:46–10 contains the substantive requirements of the plan. First, "each Congressional district shall be as nearly equal as practicable, and the difference in population between the most populous and least populous districts as small as practicable, as required by the Constitution of the United States and all applicable decisions of the Supreme Court of the United States." *N.J.S.A.* 19:46–10(b)(1).

Second,

> [n]o Congressional district shall be established [that] fragments an ethnic or racial minority community [that], if left intact, would constitute a majority or significant number of voters or potential voters within a single district with an ability to elect the candidate of their choice. For purposes of this paragraph, a minority community means any group enjoying special protection under the civil rights provisions of the Constitution of the United States and the federal "Voting Rights Act of 1965," as amended and supplemented (42 U.S.C., section 1973 et seq.).
>
> [*N.J.S.A.* 19:46–10(b)(2).]

Third, the Act requires the drawing of contiguous districts. *N.J.S.A.* 19:46–10(c). Finally, the Act provides that "[t]o the fullest extent reasonable and when not in conflict with the

foregoing standards, Congressional districts shall be drawn to preserve continuity from decade to decade." *N.J.S.A.* 19:46–10(d).

As applied to the 1992 Congressional elections the Act required submission of the plan on the later of two dates: March 20, 1992, or within three months after receipt by the Governor of the official statement by the Clerk of the House of Representatives regarding the number of Representatives to which the State was entitled. *N.J.S.A.* 19:46–9. Governor Florio signed the Act into law on January 21, 1992, leaving the Commission with approximately two months to formulate a plan. On February 13th the commissioners selected Dr. Alan Rosenthal, Director of the Eagleton Institute of Politics and Professor of Political Science at Rutgers University, to serve as the independent member.

Not surprisingly, deliberations concerning the reapportionment scheme continued until almost the last moment. With the March 20th deadline fast approaching and the possibility of a bipartisan plan diminishing, the partisan members decided that each party would present a plan to Rosenthal, who would cast the tiebreaking vote. Each party prepared a preliminary plan that the other party had an opportunity to critique, and the original plans were thereafter amended in some respects to deal with criticisms resulting from the exchange.

On March 17, 1992, three days before the deadline for submission of the plan, each side made its presentation to Rosenthal. Given the short time period remaining, those plans admittedly contained less detail than had been included in earlier submissions. The Republican and Democratic members each submitted an overall map of the state that showed the general outlines of the new districts under their respective plans. As well, each side submitted general descriptions of the proposed new districts, detailing the overall population distribution and ethnic composition, and demonstrating how the plans changed existing district boundaries. Rosenthal familiarized himself

with the two competing proposals and ultimately endorsed the Republican plan, finding that it more closely followed the Act's guidelines. Further, Rosenthal found the Republican plan "politically fairer" and a more accurate reflection of the State's political tendencies.

The final vote on the redistricting plan occurred at a meeting on the afternoon of March 20th. Republican staffers used the time between the March 17th meeting and that vote to prepare a typewritten summary of the plan that Rosenthal had endorsed on March 17th.

We pause to distinguish between two items, each of which might be called "the plan": (1) the information on computer assigning voters to various districts, according to statutory mandate, which we refer to hereafter as the "master plan"; and (2) the typewritten summary that purported to reflect the content of the master plan, which we will refer to as the "data compilation." At the time of the March 20th vote, the data for the master plan were "locked into" a computer. At the meeting the Commissioners were furnished with the data compilation, which was intended to reduce the plan into a form usable by the Secretary of State and local election districts. The Commission approved the Republican plan by a vote of seven to six, and the data compilation was thereafter forwarded to the Secretary of State.

Several days later Dr. Stephen Salmore, a consultant to the Commission's Republican contingent, noted a number of errors in transcription that caused the data compilation not to reflect the plan approved by the Commission. Salmore communicated with John Sheridan, Esq., counsel to the Republican members, who then told Rosenthal that the data compilation contained errors and omissions that caused it to deviate from the master plan for which Rosenthal had voted on March 20th. Sheridan then explained how the errors had occurred and what changes were necessary to remedy them. Rosenthal agreed that the corrections did not change the plan but rather conformed it to

the plan that he had approved, and therefore he approved their submission to the Secretary of State's office on March 24th. A day later, an error in the March 24th corrections was discovered and a final correction sent.

## II

At the outset we seek to make clear the basis for this Court's jurisdiction. This appeal involves two cases: *Save Our Shore District v. New Jersey Redistricting Commission,* and *Brady v. New Jersey Redistricting Commission.* In *Save Our Shore District,* plaintiffs, a group of residents of what was then the third Congressional district, sought from the Chancery Division an injunction barring the implementation of the redistricting plan. They contended that the Legislature had impermissibly delegated to the Commission the duty of creating a new redistricting plan. Plaintiffs also challenged certain aspects of the Act and the Commission's actions as violative of equal-protection guarantees. The trial court refused to issue the injunction and granted defendants' cross-motion to dismiss for failure to state a claim. Plaintiffs appealed that determination to the Appellate Division. Because of the importance of the question involved, we certified the cause on our own motion. See *Rule* 2:12–1.

*Brady,* on the other hand, comes to us by a different route. Plaintiff, Jane Brady, a New Jersey resident and taxpayer, relied on the following provision in the Act:

Notwithstanding any statute, rule or regulation to the contrary and except as otherwise required by the Constitution of the United States or by any federal law, no court of this State shall have jurisdiction over any judicial proceeding challenging the actions of the New Jersey Redistricting Commission, including its establishment of Congressional districts under this act, except that the Supreme Court of this State shall have original and exclusive jurisdiction to consider any cause brought upon the petition of a legally qualified voter of the State and to grant relief appropriate to the cause, including the issuance of an order to the commission to establish new districts.

[*N.J.S.A.* 19:46–13.]

Unlike plaintiffs in *Save Our Shore District* Brady did not file an action in any lower court but rather petitioned this Court directly on March 30, 1992.

 Although we appreciate the Legislature's desire to expedite appeals in an area that demands prompt judicial action, its attempt to vest this Court with original jurisdiction violates Article VI, section 3, paragraph 2 of the New Jersey Constitution, which grants to the Superior Courts "original jurisdiction throughout the State in all cases." Although section 5, paragraph 3 of that same article grants this Court such original jurisdiction "as may be necessary to the complete determination of any cause on review," the Court may exercise that jurisdiction only in a case already before it. *In re LiVolsi*, 85 *N.J.* 576, 583, 428 *A.*2d 1268 (1981). Because *Brady* was not properly before the Court on appeal, we had no power to exercise original jurisdiction through that clause. Our State Constitution therefore prohibits the Legislature from granting original jurisdiction to this Court to decide challenges to the Redistricting Commission's actions.

 The unconstitutionality of the portion of the Act that seeks to impose original jurisdiction in this Court does not, however, deprive us of the power to decide Brady's challenge. As we note *infra* at 608–609, the Redistricting Commission constitutes a specialized form of administrative agency. As such, the Commission's actions, like other final administrative decisions, are subject to appeal to the Appellate Division under *Rule* 2:2–3(a)(2). Therefore, we treated plaintiffs' petition to this Court as a notice of appeal and, exercising our power under *Rule* 2:12–1, certified the appeal on our motion.

 On a related point we note that the unconstitutionality of the judicial-review section does not render the entire Act unconstitutional, because that section is clearly severable. In deciding whether the principle of severability applies, we consider whether the Legislature "designed that the enactment stand or fall as a unitary whole." *State v. Lanza*, 27 *N.J.* 516,

527–28, 143 *A*.2d 571 (1958), *appeal dismissed,* 358 *U.S.* 333, 79 *S.Ct.* 351, 3 *L.Ed.*2d 350 (1959). Although the Legislature surely found desirable immediate Supreme Court review of challenges to the Commission's work, we do not ascribe to the lawmakers a belief that the Act should fail without that provision. The manner of judicial review was an attractive addition to the bill but not a critical feature. The Act concerned itself mainly with creating a commission to adopt a plan and establishing guidelines to assist that commission in its task. We therefore are certain that the Legislature would desire that the remainder of the enactment remain in effect despite *N.J.S.A.* 19:46–13's invalidity. Because the unconstitutional portion of the legislation is clearly severable, we proceed to address the substantive challenges in both appeals.

## III

Plaintiffs in *Save Our Shore District* argue that the Legislature had no power to delegate the responsibility of preparing a redistricting plan. The United States Constitution directs that "[t]he times, places and manner of holding elections for senators and representatives shall be prescribed in each state by the legislature thereof." *U.S. Const.* art. I, § 4, cl. 1. That power is further described by 2 *U.S.C.A.* § 2c (West 1985), which says, "there shall be established by law a number of districts equal to the number of Representatives to which [each] State is \* \* \* entitled \* \* \*." Plaintiffs contend that "by law" requires that the Legislature vote on and the Governor sign the plan. They believe that the delegation of the duty to prepare a plan, even accompanied by adequate guidelines for the plan's preparation, does not satisfy the aforementioned federal-law requirements.

We disagree. In *Keyes Martin & Co. v. Director, Division of Purchase,* 99 *N.J.* 244, 491 *A.*2d 1236 (1985), we noted that "[a]s long as the discretion of administrative officers is 'hemmed in by standards sufficiently definitive to guide its exercise,' the delegation of legislative powers is not unconstitu-

tional." *Id.* at 254₅ 491 *A.*2d 1236 (quoting *Mt. Laurel Township v. Public Advocate of N.J.*, 83 *N.J.* 522, 532, 416 *A.*2d 886 (1980) (citing *Cammarata v. Essex County Park Comm'n*, 26 *N.J.* 404, 410, 140 *A.*2d 397 (1958))). We have upheld delegation of legislative authority accompanied by much-less-specific statutory guidelines. See *Keyes Martin, supra,* 99 *N.J.* 244, 491 *A.*2d 1236 (upholding power of Director of Division of Purchase to reject lowest bid "in the public interest"); *In re Egg Harbor Associates,* 94 *N.J.* 358, 464 *A.*2d 1115 (1983) (requiring State Highway Commissioner to determine what passenger-train service is "essential in the public interest"); *Mt. Laurel Township, supra,* 83 *N.J.* 522, 416 *A.*2d 886 (permitting Public Advocate to represent the "public interest" in administrative and court proceedings); *Sprissler v. Pennsylvania–Reading Seashore Lines,* 45 *N.J.* 127, 211 *A.*2d 783 (1965) (permitting Board of Public Utilities to regulate to serve "public convenience and necessity").

■ Article V, section 4, paragraph 1 of the State Constitution provides that "[t]emporary commissions for special purposes may * * * be established by law." Under that provision, the Legislature and the Governor had the power to create a temporary commission for the special purpose of devising a redistricting plan. Although Article IV, section 5, paragraph 2 concerns the Legislature's power to create commissions "to aid or assist it in performing its functions," that section deals only with the Legislature's unilateral power to create commissions for its own purposes. Temporary commissions for special purposes, however, must be "established by law," which requires both legislative and executive action. Such commissions constitute a specialized form of administrative agency. We view Congressional redistricting as one of those limited "special purposes" in respect of which a "temporary commission" may be established under Article V, section 4, paragraph 1. Therefore, assuming satisfaction of the other requisite of a valid delegation of lawmaking authority, namely, sufficiently-detailed guidelines to hem in the exercise of that power, the Commission

could exercise the same type of legislative power as any other administrative agency that had received a similar delegation.

In this instance the enabling legislation offered several directives to ensure that the Redistricting Commission would fashion a plan consistent with the requirements of state and federal law, and a valid delegation therefore occurred. The Commission was constrained by clear mandates to satisfy the "one person-one vote" requirement as that concept has evolved from *Reynolds v. Sims*, 377 *U.S.* 533, 84 *S.Ct.* 1362, 12 *L.Ed.*2d 506 (1964), and its progeny, to protect minority voting rights, to create contiguous districts, and to avoid disruptive alteration of the existing districts.

 Another reason for requiring defined limits on the delegation is to facilitate judicial review. *Mt. Laurel Township, supra*, 83 *N.J.* at 532, 416 *A.*2d 886. The conditions placed on the Commission's actions clearly serve that purpose: an examination of the plan and the relevant census data makes possible a determination of compliance with the population-equality standard and the minority-voting-rights provision. One need only examine the map of the new districts to determine if the plan satisfies the contiguity requirement. Therefore, only the portion of the Act dealing with preserving continuity from decade to decade provides any basis for dispute, and even that broad dictate is clearly capable of judicial review to determine if the Commission acted reasonably in respect of that standard.

 We find no indication in 2 *U.S.C.A.* § 2c (West 1985) that Congress intended the narrow construction of "by law" for which plaintiffs argue. The State could use any constitutionally-sanctioned method of creating law, including, as in this case, a proper delegation of lawmaking power. Therefore, the plan was developed "by law."

The cases on which plaintiffs rely in support of their argument that the plan was not developed "by law" have refused to give effect to a redistricting plan that has bypassed a necessary

party to the lawmaking process. See, *e.g., Smiley v. Holm*, 285 *U.S.* 355, 52 *S.Ct.* 397, 76 *L.Ed.* 795 (1932) (finding Congressional-redistricting plan invalid because it had not become law in absence of legislature's override of governor's veto); *Carstens v. Lamm*, 543 *F.Supp.* 68 (D.Colo.1982) (finding that in creating Congressional districts, court should afford no preference to plan approved by legislature but vetoed by governor); see also *Grills v. Branigin*, 284 *F.Supp.* 176 (S.D.Ind.) (holding that in absence of legislative or judicial power granted under state constitution, election board could not create Congressional districts), *aff'd*, 391 *U.S.* 364, 88 *S.Ct.* 1666, 20 *L.Ed.*2d 641 (1968); *State v. Zimmerman*, 22 *Wis.*2d 544, 126 *N.W.*2d 551 (1964) (holding that to be effective, redistricting plan required approval of legislature and governor). Those cases are clearly distinguishable from the present challenge: both houses of the New Jersey Legislature passed the Act by the necessary majorities, and the Governor signed the bill into law on January 21, 1992. The Act does not attempt an "end run" around a required participant in the lawmaking process.

We note that the Legislature currently has before it an Assembly Concurrent Resolution, ACR–25, 1992, that would amend the State Constitution and create a permanent Congressional redistricting commission. Obviously, had such a constitutional provision been in place, this Court would not have had to rule on the constitutionality of the delegation involved in the present action. Nevertheless, even in the absence of such an explicit constitutional provision, the Legislature had the power to delegate the duty to prepare the current redistricting plan, and it validly exercised that power.

Plaintiffs also challenge the actions of the Legislature and the Commission on equal-protection grounds. They claim that they were deprived of a voice in the plan because no citizen of their district had been included in the Commission's membership and because of certain procedures employed by the Commission in the conduct of its public meetings. The Equal

Protection Clause protects against "the unequal treatment of those who should be treated alike." *Greenberg v. Kimmelman,* 99 *N.J.* 552, 568, 494 *A.*2d 294 (1985). That clause protects against discriminatory governmental classifications of persons not related to some appropriate state interest. Quite simply, plaintiffs have failed to point to any classification at all that excluded them from participation. We therefore find plaintiffs' equal-protection claim without merit.

## IV

Turning now to plaintiff Brady's attacks on the plan, we are mindful of the very limited nature of our review. Brady has not challenged the Act as failing to satisfy state and federal guidelines, and therefore our disposition of her claims does not require any ruling on the validity of the standards in *N.J.S.A.* 19:46–10. Rather, Brady contends that the plan fails to satisfy the requirements of the statute. We conclude that the plan meets those requirements. Our inquiry requires no more expansive resolution, and we decline to extend our ruling any further.

Brady contends that the plan violates the Act for a number of reasons, nearly all of which relate to the data compilation submitted to the Secretary of State on March 20th. Brady views the "corrections" offered on March 24th and March 25th as attempts to "change" the plan. She contends that the Commission's power to alter the plan—even to remedy clerical errors—ended when it forwarded the data compilation to the Secretary of State on March 20th. She asks the Court to view any attempted variation of the data compilation as *ultra vires.* Moreover, she charges that the uncorrected plan fails to achieve population equality among the districts, fails to preserve minority voting rights, and creates noncontiguous districts.

Before deciding Brady's other objections to the redistricting plan, we must address whether the Commission had the

power to correct errors in the original plan. If, as plaintiff Brady contends, the Commission was powerless to amend the data compilation in any way after submitting it on March 20th, the redistricting plan described by the March 20th submission would contain a number of constitutional infirmities. However, we disagree with Brady's argument that the Commission was compelled to chisel a plan into stone and was powerless to correct any errors.

Plaintiff Brady contends, erroneously, that the Commission expired on March 20, 1992, after it had approved a redistricting plan. The language of the Act, amply supported by good sense, reveals the flaws in that argument. The Act required that the Redistricting Commission certify a redistricting plan by March 20, 1992. Nevertheless, the Act provides that *N.J.S.A.* 19:46–6, which establishes the Commission, expires on January 1, 2001. *L.*1991, *c.* 510, § 12; *N.J.S.A.* 19:46–6 Note. That provision clearly contemplates that the Commission would remain in effect and could take steps necessary to fulfill its statutory mandate after March 20, 1992. The residual powers of the Commission surely included the ability to correct clerical errors to aid implementation of the plan. Indeed, we can envision few other reasons for the Commission's existence after March 20, 1992, except to clarify, if necessary, questions and disputes that might arise about the plan.

Further, the Commission had only minimal time to devise a plan that satisfied the statute's directives. That a document of the size and complexity of the data compilation, prepared under the time strictures the Commission faced, would contain some transcription or typographical errors was not only foreseeable but probably inevitable. Although the Legislature desired precision, we cannot imagine that it intended the Act to impose the all-or-nothing requirement of a perfect written transposition. The pencil that the Legislature handed to the Commission was doubtless equipped with an eraser.

The shortcoming of plaintiff's argument becomes even clearer if one imagines a circumstance in which the data compilation contained a single error that incorrectly listed by one the number of persons in a given census block. Under Brady's position that error would deprive the entire plan of legal effect, even though the data compilation correctly reflected the plan regarding the State's remaining 7,730,187 residents.

Other courts have freely permitted correction of similar kinds of errors. In *Silver v. Brown*, 63 *Cal.*2d 841, 48 *Cal.Rptr.* 609, 409 *P.*2d 689 (1966), the California Supreme Court, faced with a state reapportionment statute containing numerous ambiguities and technical errors, construed those defects in the plan according to its understanding of the legislative intent. In *Miller v. Schaffer*, 164 *Conn.* 8, 320 *A.*2d 1 (1972), the Connecticut Supreme Court found that "[s]ince the court has the power to require or formulate a valid reapportionment plan, it certainly is empowered to correct clerical errors in the existing plan and to construe it in accordance with its original intent."

Although those cases dealt with a court's power to remedy clerical deficiencies in a plan rather than the power of a redistricting commission to correct errors in its own plan, they demonstrate that clerical errors do not deprive an otherwise-valid redistricting plan of legal effect. Those courts looked to the legislative intent behind those plans to fashion corrections. We need not embark on a far-reaching search for the intent of the drafters of the plan: the chairman of the Commission has unequivocally stated what the Commission intended, and he has approved corrections that he finds square the plan with the Commission's original intent.

The March 20th deadline was not intended as an execution hour for the Commission. Rather, that deadline's purpose was to compel the Commission to produce a plan in adequate time before the April 9th filing deadline for the primary elections. Because we are satisfied that the Commission retained the power to correct clerical errors in the data compilation, we turn

now to the changes submitted on March 24th and 25th to determine if the "corrections" merely brought the data compilation into conformity with the master plan approved by the Commission on March 20th or if they altered the plan originally approved by the Commission.

## V

■ The data compilation attempts to reflect the master plan by showing where each voter is assigned under the new plan. The data compilation consists of four different types of listings. First, it lists by district the municipalities in each district. If only part of a municipality is in a district, the word "part" appears after the municipality's name. For municipalities not located in only one district we use the term "split municipalities." Second, the plan contains a list of split municipalities by county. Third, the compilation contains a listing of the split municipalities by district. For each split municipality in those portions of the data-compilation listings, the compilation includes the number of citizens in that municipality who would be included in the respective districts in which that municipality would belong.

Finally, the compilation includes what we refer to as the "detail information," which shows the district assignments for the voters in the split municipalities. The detail information breaks down the split municipalities into voter-tabulation districts, which consist of certain groupings of census blocks; and to achieve numerical equality as nearly as possible, the plan further dissects census blocks—previously the atomic units of measure in redistricting—into smaller components called "census block splits." The detail information in this fourth part of the data compilation contains the listings of voter-tabulation districts and census-block splits for each district. That portion of the plan contains the errors that plaintiff Brady contends render the plan void.

As explained earlier, after the discovery of the errors in the detail information, John Sheridan, counsel to the Republican members of the Commission, communicated with Rosenthal on March 23rd to alert him to the errors in the data compilation. Sheridan explained the changes that were necessary to conform the compilation with the plan that Rosenthal had approved on March 20th. After listening to Sheridan's explanations, Rosenthal authorized the submission of certain corrections. On March 24th, Stephen Salmore therefore submitted information aimed at removing the inaccuracies in the compilation. We refer to that information as comprising the "initial corrections." A day later, an error on one of the pages of the initial corrections was discovered, and Salmore promptly submitted a final correction, henceforth referred to as the "supplemental correction."

We have no doubt that the initial corrections and the supplemental correction conform the compilation to the plan approved by the Commission on March 20th. Rosenthal, who listened to each side's description of its proposed plan, voted for the Republican proposal, and approved the submission of the corrections, has filed a certification informing us that the corrections do not alter the plan that he approved on March 20th. Further, we have the uncontested certification of G. Chistom Larsin, a computer scientist employed by the Republican commissioners, which states that all district boundaries and municipal splits were completed and electronically "locked into" a computer before the Commission's 2:00 p.m. meeting on March 20th and that that information remains unchanged. The detail information in the fourth portion of the data compilation does not match the other three categories of information provided to the Secretary of State if the corrections are not included in the plan, and plaintiff Brady does not contend that the corrections in the detail information create a variance with the three earlier listings in the data compilation.

Brady has cited several instances in which she claims that the corrections "change" the plan. The first problem arose out of a

pagination error by Brady in assembling the appendix accompanying her brief to this Court. Brady labels what should be page 43 of the plan as page 45, an error that shifts 5,307 persons from the 9th Congressional district to the 13th. Nevertheless, plaintiff's error immediately pops up on cursory examination, and once the information is properly paginated, the detail information exactly corresponds with the master plan and the other three sections of the data compilation. Brady's first challenge therefore arises from her own clerical error and not from any infirmity in the plan.

Second, plaintiff Brady alleges that fifteen voters in Millburn were assigned to two districts, creating a "one person-two vote" situation. Indeed, under the detail information, the plan apparently placed those persons in voting districts 7 and 11. According to the master plan and the other three sections of the data compilation's listing of split municipalities, 18,221 Millburn voters were placed in district 7 and 409 were placed in district 11. The error in the detail information occurred because an additional five census blocks consisting of fifteen voters were included—incorrectly—in the listing for district 7. In attempting to define district 11 as including all census blocks except voter tabulation district MOO-4, the plan inadvertently omitted five other census blocks that should have been included in the "except" clause.

The original corrections attempted to remedy that discrepancy, defining the district by listing the voter-tabulation districts included rather than describing it by exclusion of certain districts. Unfortunately, the March 24th submission also contained an error: it indicated that the balance of Millburn was in district 8 instead of 7, the correct district. The supplemental correction removed that error. The amendments to the plan bring it into conformity with the master plan and the other three sections of the data compilation. In no way do they substantively change the plan.

Third, plaintiff Brady contends that the plan failed to assign most of the citizens of Linden to a Congressional district. The master plan and the remainder of the data compilation show that 4,249 Linden residents were assigned to district 7; 27,824 were assigned to district 10; and 4,628 were assigned to district 13. The data compilation fails to give the detail information for the Linden voters assigned to districts 10 and 13. The original corrections remedied that problem by listing the voter-tabulation districts included in those districts, and those tallies precisely match the information in the master plan and the other three sections of the data compilation.

Fourth, Brady challenges the redistricting as it pertains to Maplewood Township because the master plan and the other sections of the data compilation break the Township into three districts, whereas the detail information divides it into only two. Plaintiff's charge again is easily addressed by identifying the source of the confusion and plugging in the corrective material supplied on March 24th. The information for district 10 was wrongly labelled as information for district 7. The information for district 8 goes awry because it attempts to define the district by exclusion, defining the district as all those districts not included in district 10, and failing to account for the Maplewood voters in district 7. The original corrections clear up that confusion and assign the voters to their respective districts in exactly the same manner as provided in the master plan and the remainder of the data compilation.

Fifth, Brady challenges the redistricting for South Orange, West Orange, and Woodbridge because the data compilation does not include the detailed breakdown for the assignment of voters in those municipalities. The omitted detail for those municipalities was submitted on March 24th and exactly mirrors the description in the master plan and the other three sections of the data compilation.

Brady's sixth challenge fails for similar reasons. Brady contends that the plan relocated 16,250 Jersey City residents to

district 10. The March 24th corrections show that the problem arose from the omission of the detail information for those voters, and the original corrections present the information for those voters in a way entirely consistent with the master plan and the other portions of the data compilation.

Therefore, we conclude that the information submitted to the Secretary of State on March 24th and 25th merely remedies clerical and technical errors in the data compilation. That information in no way alters the plan that the Redistricting Commission approved on March 20th.

## VI

 Brady raises two arguments attacking the validity of the corrected plan. First, she asks the Court to strike down the plan because the data compilation does not include information that enables a reader to determine whether the plan protects minority voting rights. From that, Brady argues that the Commission did not have adequate information to determine if the plan complied with the statutory mandate to ensure such protection, and she maintains that the numerous errors, omissions, and typographical errors in the data compilation demonstrate that the Commission acted on insufficient information.

We disagree. For the Commission members to pick through the date compilations to determine if the information for every voter-tabulation district precisely matched the plan was not necessary: the master plan, which was locked into the computers, was available on March 20th to any Commission member desiring that information. Errors in transcribing the data on computer do not equate with lack of data. The data available to the seven members who voted for the plan included information revealing the general contours of the new districts and their ethnic composition, and information on how the plan would change the existing district boundaries.

Dr. Rosenthal's certification buttresses the conclusion that the Commission was aware of the guidelines for the plan's preparation. He said:

> To facilitate the submission of rival [p]lans, I informed both the Republican and Democratic delegations on the Commission of my desires and criteria with respect to an acceptable [p]lan. In addition to the requirements set forth in our "charter" (the law setting up the Commission), which included population equality, preservation of minority voting strength, contiguity, and continuity, my other main concern was to produce a [p]lan that was politically fair and promoted bipartisanship.

Rosenthal explained his vote in favor of the Republican plan as follows:

> I selected the Republican proposal because, in my judgment, it (a) satisfied all of the statutory criteria set forth in the enabling act (*L.*1991, *c.* 510, approved Jan. 21, 1992) and (b) was more politically fair than the proposal submitted by the Democratic Commissioners. New Jersey is essentially a swing [s]tate politically, and I believe that the districts should reflect the voting patterns of the electorate as a whole, which the Republican [p]lan did. The Republican plan also achieved the lowest possible deviations, it preserved an African–American congressional district with a [b]lack population of slightly more than 60%, and it created a Hispanic minority-influenced district with a Hispanic population of approximately 42%, which when combined with the district's [n]on-Hispanic [b]lack population created a district with a combined minority population in excess of 50%. The Republican [p]lan also achieved greater continuity from decade to decade, as required by the Commission's enabling act.

We view Dr. Rosenthal's certification as persuasive evidence that the Commission both had and evaluated the information necessary to fulfilling the Commission's duty. In his explanation of his vote for the Republican plan, Dr. Rosenthal cites two examples of measures that the Commission took to preserve minority voting strength, and he provides statistical support for those conclusions. Dr. Rosenthal's statements show that the statutory criteria were paramount in the drawing of the parties' plans and in Rosenthal's ultimate approval of the Republican plan.

If Brady's attack on the plan be viewed as based not on the proposition that the Commission ignored its statutory mandate to maintain minority voting rights but rather on the notion that the plan's failure to include statistical analysis of the minority composition of the new districts renders the plan not suscepti-

ble to judicial review, her challenge to the plan still fails. Although the plan does not on its face contain minority-voting-rights information, the determination whether minority voting blocks have been adversely affected is readily accomplished by cross-referencing to the census. The data compilation provides the census blocks included in each district, and the census includes the demographic composition of those census blocks. Combining those two resources, the Court and a challenger can test for dilution of minority voting rights. Therefore, the plan is susceptible of judicial review.

 Lastly, Brady asks the Court to deny effect to the plan because it fails to "preserve continuity from decade to decade" as required by the Act. *N.J.S.A.* 19:46–10(d). Of course, the Act qualifies that duty somewhat by adding the sensible condition "to the fullest extent reasonable and when not in conflict with [the Act's other requirements]." *N.J.S.A.* 19:46–10(d). That condition demonstrates that the Legislature, although desiring as little disruption as necessary in the apportionment scheme, obviously considered preservation of continuity subordinate to the goals of population equality, preservation of minority rights, and contiguity. The Act seeks to provide "reasonable protection from decade to decade against disruptive alteration due to redistricting." *N.J.S.A.* 19:46–10(a).

Obviously, changes had to occur. A certain measure of discontinuity was inevitable in dividing the state into thirteen parts instead of fourteen. We fail to perceive any support for Brady's claims of "disruptive alteration" beyond the bald assertion that the division of various Middlesex County municipalities that formerly were all part of one district into four districts violates the Act. We detect as well in the complaint of plaintiff Save Our Shore District a similar concern. Underlying that complaint is the contention that the new map undermines the community of interest that binds together the Shore, a place of beaches, inland bays, tidal estuaries, and bird sanctuaries. Under the new map, the Shore is losing the Congressional district

that had previously embraced coastal communities in Monmouth and Ocean Counties. Nevertheless, the shared interests of communities are determined not solely by the cartographer's line but also by historical, social, economic, and ethnic realities wholly divorced from the mapmaker's art. We do not share Brady's view of continuity, which considers only geographic factors. As the United States Supreme Court noted in *Reynolds, supra,* 377 *U.S.* at 580, 84 *S.Ct.* at 1391, 12 *L.Ed.*2d at 538, "[P]eople, not land or trees or pastures, vote." Further, the Legislature rejected Brady's narrow view of continuity: the bill as originally drafted called for districts to be "drawn to preserve geographic continuity," but the Legislature amended that portion to provide instead that the districts be "drawn to preserve continuity from decade to decade." *Assembly Bill* 5307, 1990.

We do not mean to discount county lines as a valid measure of community of interest, for certain benefits and burdens of county citizenship do provide a common bond. But the Legislature recognized that other factors have importance as well, and it permitted the Commission to consider those additional factors in its decisionmaking. Also, county boundary lines assume less importance in Congressional redistricting than in state reapportionment, because a United States representative is less likely than a member of the New Jersey Senate or Assembly to sponsor or be called on to consider legislation that affects only one county. The focus of national legislation requires a much wider lens than lawmaking at the state level. Because of that difference, county borders take on lesser significance in Congressional reapportionment. Plaintiff Brady has offered no evidence that the division of Middlesex County will deprive her of responsive representation or "disrupt" any significant expectation attached to membership in her former district.

"Continuity" in a plan that concededly required change is a difficult goal to attain. In response to that difficulty, the

Legislature did not attempt to place stringent qualifications on the Commission's duty to preserve continuity. We are satisfied that the plan satisfies that stated goal as much as possible without doing violence to the Act's more important mandates, particularly in light of Brady's failure to demonstrate how the plan has failed to satisfy the more important goals of population equality, preservation of minority voting rights, and contiguity.

## VII

We therefore uphold the Redistricting Commission's plan. So ordered.

*For affirmance*—Justices CLIFFORD, HANDLER, O'HERN, STEIN and SKILLMAN—5.

*For concurrence in result*—Justice O'HERN—1.

*For reversal*—None.

O'HERN, J., concurring.

I concur in the opinion and order of the Court dismissing the challenges to the 1992 congressional redistricting plan. I write separately, however, because it may be perceived that dismissal of the petition conveys the impression that the plan is judicially required.

The New Jersey Redistricting Commission has enacted a plan to meet the one-person-one-vote mandate of *Karcher v. Daggett*, 462 *U.S.* 725, 103 *S.Ct.* 2653, 77 *L.Ed.*2d 133 (1983), but, in my view, may have failed to advance other representative values of a self-governing society.

County and community boundaries, even voting districts themselves, have been split in the name of mathematical equality. I would not begin to know the intricacies of such "automated redistricting models," Michelle H. Browdy, Note, *Computer Models and Post–Bandemer Redistricting*, 99 *Yale L.J.* 1379,

1384–89 (1990), or to the extent to which such models can be manipulated. I do have a sense, however, that the framers of our Constitution, who placed such a high value on the dignity of the individual and on the importance of human values, would have never subordinated civic responsibilities to the workings of a machine. Can one imagine civic boundaries drawn by a computer? Nothing in our law commands such a loss of human values in civic planning.

In *Karcher v. Daggett, supra,* which invalidated New Jersey's 1982 reapportionment plan, Justice Brennan explained that the Court will tolerate "minor population deviations" caused by state legislative policies, such as "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." 462 *U.S.* at 740, 103 *S.Ct.* at 2663, 77 *L.Ed.*2d at 147. Justice Stevens, concurring in that 5–4 decision, emphasized that for him it was the political gerrymandering of districts that made the 1982 plan invalid. *Id.* at 744, 103 *S.Ct.* at 2665, 77 *L.Ed.*2d at 151. Justice Stevens explained that he would accord a strong measure of deference to the otherwise legitimate concerns of the State. *Id.* at 760 n. 26, 103 *S.Ct.* at 2675 n. 26, 77 *L.Ed.*2d at 161 n. 26.

We have no record of the Commission's deliberations so we do not know what effort was made at "preserving" the cores of prior districts or of "respecting municipal boundaries." Under the plan, most of Middlesex County's population of approximately 672,000 could be included in one congressional district. Instead, the plan divides the county among four congressional districts. Hudson County, which is separated from Middlesex County by centuries of history and tradition, is joined with Middlesex by a land bridge including parts of Union and Essex Counties. I realize that the Redistricting Act seeks the "preservation of minority voting status within each district," *L.*1991, *c.* 510, § 5a, but to "preserve" a minority district is one thing; to create one artificially is another. Communities on the Atlantic estuaries are joined with communities on the upper Dela-

ware rather than their historic neighbors up and down the rivers of the Atlantic. I do not have the same familiarity with northern regions of the State to sense how communities have been affected. I note that Maplewood is in three congressional districts as are Jersey City and Linden.

There is a growing concern in our country about public life—a sense that government is no longer accountable to the people but rather advances itself or the interests of groups other than its constituencies. Voter turnout continues to decline because of the perception that votes do not count. Voters feel alienated from their elected representatives. The Kettering Foundation reports that the public perceives our political system "as so autonomous that the public is no longer able to control and direct it." *The Voters, Yes. But Which Ones?*, N.Y. Times, April 10, 1992, at A36. Elected officials are equally disenchanted; our senior congressional representatives have withdrawn from public life. A major theme of the recent presidential election was to dispel the public sense of powerlessness to affect our political arrangements.

I would not claim to know the answer to such concerns but I do not think that a computer-driven process that divides communities and regions in the name of mathematical equality is the answer. It would seem to me, subject to necessary voting-rights limitations, that a sense of place and a sense of community are vital to the shared values that a member of Congress should represent. " 'Congressmen representing these stretched-out districts haven't got any common electorate * * * [and such redistricting] destroys the notion that there are common questions and problems shared based on where people live, and says instead that the problems they share are based on their ethnicity.' " Todd S. Purdum, *Districts Drawn for Minority Votes Complicate New York's Election*, N.Y. Times, August 16, 1992, at 1, 41 (quoting Edward Costikyan). And on that score of voting rights, I do not believe that recognition of considerations beyond ethnicity would constitute voting rights dilution unless a "distinctive minority vote" of a "geographical-

ly compact" minority community is "thwart[ed] * * * by submerging it in a larger white voting population." *Growe v. Emison*, —— *U.S.* ——, 113 *S.Ct.* 1075, 122 *L.Ed.*2d 388 (1993).

The Commission may have attempted to address those concerns, but we have no record of such attempts. The Commission's process of deliberations is not open and the public does not have the benefit of the reasoning that might give public confidence to the plan.

Courts cannot, however, substitute their judgment for that of elected (or, as here, appointed) representatives of the people. Courts are limited to consider only constitutional and statutory restraints on the exercise of redistricting power. *Davis v. Bandemer*, 478 *U.S.* 109, 106 *S.Ct.* 2797, 92 *L.Ed.*2d 85 (1986). Section 5 of the Redistricting Act, *L.*1991, *c.* 510, allows the Commission to adopt the plan and the Constitution does not forbid it.

By the same token, the Constitution does not require the loss of community values and sense of place with respect to their congressional representation that these petitioners have experienced. The State has the power to address what Justice Stevens referred to as the " 'legitimate considerations' " of government. *Karcher v. Daggett, supra*, 462 *U.S.* at 760, 103 *S.Ct.* at 2675, 77 *L.Ed.*2d at 161 (quoting *Reynolds v. Sims*, 377 *U.S.* 533, 579, 84 *S.Ct.* 1362, 1391, 12 *L.Ed.*2d 506, 537 (1964)). That power needs only to be exercised.