John Robert SMITH, Shirley Hall, and Gene Walker, Plaintiffs,

v.

Eric CLARK, Secretary of State of Mississippi; Mike Moore, Attorney General for the State of Mississippi; Ronnie Musgrove, Governor of Mississippi; Mississippi Republican Executive Committee; and Mississippi Democratic Executive Committee, Defendants.

Beatrice Branch; Rims Barber; L.C. Dorsey; David Rule; James Woodard; Joseph P. Hudson; and Robert Norvel, Intervenors.

No. CIV.A. 3:01–CV–855WS.

United States District Court, S.D. Mississippi, Jackson Division.

Feb. 26, 2002.

---

Arthur F. Jernigan, Jr., Watson & Jernigan, P.A., Jackson, MS, for John Robert Smith, Shirley Hall, Gene Walker.

T. Hunt Cole, Jr., Office of the Attorney General, Michael B. Wallace, Phelps Dunbar, John G. Jones, Jones & Funderburg, Herbert Lee, Jr., Lee & Associates, Robert B. McDuff, Robert B. McDuff, Attorney, Jackson, MI, for Eric Clark, Secretary of State of Mississippi, Mike Moore, Attorney General for the State of Mississippi, Ronnie Musgrove, Governor of Mississippi, the Mississippi Republican Party Executive Committee, Mississippi Democratic Party Executive Committee.

E. GRADY JOLLY, United States Circuit Judge, HENRY T. WINGATE, United States District Judge and DAVID C. BRAMLETTE, United States District Judge.

## OPINION

E. GRADY JOLLY, Circuit Judge.

Today we have enjoined the defendants from implementing the congressional redistricting plan for the 2002 primary and general election that was adopted by the Hinds County, Mississippi chancery court. We have ordered the defendants to conduct said congressional elections based on this court's plan issued on February 4, 2002. The basis for this injunction and order is reflected in our opinion of February 19, that is, the failure of the timely preclearance under § 5 of the Voting Rights Act of the Hinds County Chancery Court's plan. The opinion that follows, holding that the adoption of the state court's plan is unconstitutional, for the reason that it violates Article I, Section 4 of the United States Constitution, is this court's alternative holding, in the event that on appeal it is determined that we erred in our February 19 ruling. Furthermore, inasmuch as the Intervenors are

presently seeking a stay of this court's orders, it is expedient and efficient that the Supreme Court have before it the case as a whole, instead of truncated sub-parts.[1]

## I

Our order entered on January 15, 2002, and our opinion filed on February 19, 2002, contain the facts and procedural history of the case before us, and we refer to those documents for the background of this case. As we noted in our opinion of February 19 (footnote 7 on page 43), there remain, however, other constitutional questions raised by the plaintiffs as to the chancery court plan, that have remained dormant awaiting preclearance. Primarily, the plaintiffs have contended from the beginning of this lawsuit that under the United States Constitution, a state court may not constitutionally redistrict a state for United States congressional elections; that under the Constitution only the legislature can do so.[2]

The United States Constitution specifically provides in Article I, Section 4: "The Times, Places and Manner of holding Elections for Senators and Representatives *shall* be prescribed in each State by the *Legislature* thereof." (Emphasis supplied.) No case—or any other authority—has ever expressed doubt that this constitutional provision applies to congressional redistricting. Consequently, this provision is indisputably applicable to congressional redistricting in the state of Mississippi in 2002. Because the issue is squarely presented by the plaintiffs, we cannot—nor can any other court or any other party to the case before us—sidestep this express provision of the United States Constitution. The specific question we must confront is: What is the practical meaning of this constitutional provision, and how it is to be applied here, where the state chancery court—not the legislature—prescribed the "Places and Manner of holding Elections for ... Representatives ...."

In determining this question, we have looked to the plain meaning of the easily understood words of this section, and applied it to the facts before us. We have then looked to case authority, including authorities of the Supreme Court of the United States, the lower federal courts, and the state courts that have addressed this particular section of the Constitution. This review of authorities leads us to this conclusion: Although the constitutional provision may not require the state legislature itself to enact the congressional redistricting plan, the state authority that produces the redistricting plan must, in order to comply with Article I, Section 4 of the United States Constitution, find the source of its power to redistrict in some act of the legislature.

This predicate conclusion raises the next question that we must resolve: whether any enactment of the Mississippi legislature grants to the chancery court the power to redistrict the State of Mississippi for congressional elections. We find no such statute. Furthermore, no case of the Mississippi Supreme Court has ever indicated there is such a statute. We thus come to the final conclusion that the redistricting plan for congressional elections in 2002 produced by the Hinds County Chancery Court transgresses Article I, Section 4 of the United States Constitution, is therefore unconstitutional, and is consequently a nullity. We order it enjoined and direct

---

1. We have jurisdiction to address this question pursuant to 28 U.S.C. § 2284(a) ("[a] district court of three judges shall be convened ... when an action is filed challenging the constitutionality of the apportionment of congressional districts").

2. The plaintiffs also argue that their due process rights were violated in the state court proceeding, by, *inter alia,* an expedited schedule that denied an adequate opportunity to conduct discovery, which prevented meaningful participation in the Chancery Court trial.

that the said 2002 elections be conducted on the basis of the plan described in and attached to our February 4, 2002 order.

## II

### *The Meaning of the Term "Legislature"*

■ We turn now to investigate and resolve the meaning of the term "Legislature" as used in Article I, Section 4, to consider whether the chancery court can fall within the meaning of that term and to provide the appropriate remedy.

### A

### *The Constitutional Clause*

To begin, we turn our attention specifically to the words of Article I, Section 4: Reviewing the plain language, the provision provides that the "Times, Places and Manner of holding Elections for Senators and Representatives shall be prescribed in each state by the Legislature thereof." [3] Applying these words to the facts before us, everyone agrees that the legislature has not enacted a redistricting plan. Instead of the legislature, the chancery court has chosen the "Places and Manner" of conducting the congressional elections in Mississippi. It would surely seem, on the basis of the plain constitutional language, that the chancery court's order implementing its plan constitutes a violation of Article I, Section 4. But, the answer is not quite so simple. We therefore turn now to consider the cases that have considered the meaning of "Legislature."

### B

### *Cases Considering the Term "Legislature"*

Only a few cases have construed this constitutional term. One of the earliest Supreme Court cases is *Davis v. Hildebrant,* 241 U.S. 565, 566, 36 S.Ct. 708, 60 L.Ed. 1172 (1916). There, the constitution of the State of Ohio was amended in 1912 to vest the legislative power not only in the general assembly, but also in the people by way of popular referendum and initiative.[4] Thus, the people could disapprove, by popular referendum, any law passed by the General Assembly. The General Assembly passed a congressional redistricting plan, which then was disapproved by referendum. In 1911, Congress had passed a Reapportionment Act, which allowed states which had the same or an increased number of congressional representatives to redistrict "in the manner provided by the laws thereof," [5] pursuant to Congress's au-

---

**3.** The rest of the clause reads: "but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

**4.** The Ohio Constitution provides, in relevant part:
The legislative power of the state shall be vested in a General Assembly consisting of a senate and house of representatives but the people reserve to themselves the power to propose to the General Assembly laws and amendments to the constitution, and to adopt or reject the same at the polls on a referendum vote as hereinafter provided. Ohio Const. Art. II, § 1.

**5.** Specifically, Section 4 of the Act provided:
That in case of an increase in the number of Representatives in any State under this ap-

portionment such additional Representative or Representatives shall be elected by the State at large and the other Representatives by the districts now prescribed by law until such State shall be redistricted in the manner provided by the laws thereof and in accordance with the rules enumerated in section three of this Act . . . .
Apportionment Act of Aug. 8, 1911, c. 5, § 4, 37 Stat. 13, 14. This section expired by its own limitation upon the enactment of the Reapportionment Act of June 18, 1929, c. 28, § 22, 46 Stat. 21, codified at 2 U.S.C. § 2a. The current § 2a provides methods for electing representatives when there has been a change in the number of representatives allotted to the state "[u]ntil a State is redistricted in the manner provided by the law thereof . . . ." 2 U.S.C. § 2(a)(c). This plainly implies that states can redistrict according to the

thority under Article I, Section 4. A suit was brought in the Ohio Supreme Court, arguing that the referendum power was not validly part of the legislative power of the state and that the use of the referendum in this case violated Article I, Section 4. The Supreme Court of Ohio upheld the referendum procedure, noting that under the reserved powers in the Tenth Amendment to the United States Constitution, the people could determine the "character of [their] Legislature," and that "by the adoption of the amendment of 1912 [to the Ohio constitution] the people expressly limited this legislative power by reserving to themselves the power to reject any law ·by means of a popular referendum." *Davis v. Hildebrant*, 94 Ohio St. 154, 161–62, 114 N.E. 55 (Ohio 1916). The Supreme Court affirmed the holding of the Ohio Supreme Court, finding that the referendum provision did not violate state or federal law, or Article I, Section 4. *Davis*, 241 U.S. at 569–70, 36 S.Ct. 708. The Court stated that "so far as the state had the power to do it, the referendum constituted a part of the state Constitution and laws, and was contained within the legislative power." *Id.* at 568, 36 S.Ct. 708. As to the Reapportionment Act of 1911's provi-

sion for reapportionment according to the "laws" of a state, the Court held that "by inserting a clause plainly intended to provide that where, by the state Constitution and laws, the referendum was treated as part of the legislative power, the power as thus constituted should be held and treated to be the state legislative power for the purpose of creating congressional districts by law." *Id.* The Court further held that including the referendum within the state legislative power did not violate Article I, Section 4, as Section 4 allows Congress to make regulations for the choosing of Representatives, and Congress had expressly permitted states to reapportion according to the laws of the state. *Id.* at 569, 36 S.Ct. 708. In short, because the referendum invalidating the congressional districts was derived from the legislative power of the state constitution, it comported with the requirements of Article I, Section 4. *Davis*, however, demonstrates some flexibility in Article I, Section 4, because it suggests that the term "Legislature" is not confined to the state legislature as an institutional body, but also encompasses the initiative, authorized by the state constitution, as a source of legislative power under state law.[6]

"laws thereof." Laws can only be enacted by the legislature. This is in accord with the power granted to the legislature by Article I, Section 4. Of course, if there were any conflict between a congressional act and the Constitution, the Constitution would necessarily prevail.

6. Although Mississippi allows voters to approve constitutional amendments by referendum, *see* Miss.Code Ann. § 23–15–369, and to propose constitutional amendments by initiative, *see* Miss.Code Ann. § 23–17–1, *et seq.*, this is not at issue in the case before us. Other than these provisions, the legislative power is vested by the constitution exclusively in the legislature. The Mississippi Constitution, Article 1, § 1 provides that: "The powers of the government of the state of Mississippi shall be divided into three distinct de-

partments, and each of them confided to a separate magistracy, to-wit: those which are legislative to one, those which are judicial to another, and those which are executive to another." The constitution further limits the exercise of each power to the branch in which it is vested: "No person or collection of persons, being one or belonging to one of these departments, shall exercise any power properly belonging to either of the others. The acceptance of an office in either of said departments shall, of itself, and at once, vacate any and all offices held by the person so accepting in either of the other departments." Miss. Const. Art. 1, § 2. The legislative power is vested exclusively in a legislature: "The legislative power of this state shall be vested in a legislature which shall consist of a senate and a house of representatives." Miss. Const. Art. 4, § 33.

In *Smiley v. Holm,* 285 U.S. 355, 361, 52 S.Ct. 397, 76 L.Ed. 795 (1932), the Minnesota legislature had redistricted the state's congressional seats and the governor had vetoed the plan, but the Minnesota House of Representatives directed the Secretary of State to implement the plan despite the fact that the legislature had not overridden the governor's veto, as required by Minnesota law. The plaintiff in *Smiley* alleged that the governor's veto had invalidated the plan. The issue presented was whether a governor could veto a congressional redistricting plan given the reference in Article I, Section 4 to the "Legislature" only. The court found that the reference to the "Legislature" of a state in Article I, Section 4 did not invest the Legislature with "a particular authority ... the definition of which imports a function different from that of lawgiver ...." *Id.* at 365, 52 S.Ct. 397. Rather, "the exercise of the authority must be in accordance with the method the state has prescribed for legislative enactments." *Id.* at 367, 52 S.Ct. 397. Therefore, because the laws of Minnesota allowed for a gubernatorial veto of legislative enactments, it was proper for the Governor to veto the redistricting legislation. *Id.* at 369, 52 S.Ct. 397. *Smiley* concluded:

> It clearly follows that there is nothing in article I, [§ ] 4, which precludes a state from providing that legislative action in districting the state for congressional elections shall be subject to the veto power of the Governor as in other cases of the exercise of the lawmaking power.

*Id.* at 372–73, 52 S.Ct. 397. *Smiley* indicates that congressional redistricting must be done by a state in the same manner that other legislative enactments are implemented. *See also Carstens v. Lamm,* 543 F.Supp. 68, 79 (D.Colo.1982) ("Congressional redistricting is a law-making function subject to the state's constitutional procedures."; citing *Smiley* ). These two cases, *Davis* and *Smiley,* seem to constitute the complete list of Supreme Court cases that provide some definition for the term "Legislature."

There is, however, one lower federal court case that has addressed the question, *Grills v. Branigin,* 284 F.Supp. 176, 178 (S.D.Ind.), *aff'd,* 391 U.S. 364, 88 S.Ct. 1666, 20 L.Ed.2d 641 (1968). This case involved a challenge to several statutes passed by the Indiana General Assembly reapportioning the state's congressional districts. One of the plaintiffs requested that the defendants, the members of the State Election Board of Indiana, be authorized to reapportion the congressional districts. The court denied this request, noting:

> Article I, Section 4, Clause 1 of the United States Constitution clearly does not authorize the defendants, as members of the Election Board of Indiana, to create congressional districts. This power is granted to the Indiana General Assembly and the Election Board does not possess the legislative power under the Indiana Constitution nor does it possess judicial power under the Indiana Constitution. In the case of *Smiley v. Holm* [ ] it was held that Article I, Section 4, Clause 1 of the United States Constitution's reference to the legislature of the several states required complete legislative treatment of a Districting Act which included the approval of the Governor.

*Id.* at 180. This case indicates that there must be some delegation of legislative authority, delegated by a legislative enactment of some sort, to draw congressional districts.

. In sum, these three cases—the only ones that we have found that are helpful in defining the term "Legislature"—have made clear that the reference to "Legislature" in Article I, Section 4 is to the lawmaking body and processes of the state.

These cases suggest that congressional redistricting must be done within the perimeters of the legislative processes, whether the redistricting is done by the legislature itself or pursuant to the valid delegation of legislative power. We have found no cases that support a contrary conclusion.[7]

## C

### *Growe v. Emison*

The Intervenors understandably rely on *Growe v. Emison*, 507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) and argue that it trumps all cases we have discussed respecting Article I, Section 4 in redistricting matters. At the outset, we should note our agreement with the Intervenors that

*Growe* seems to stand for the proposition that the role of state courts in redistricting, generally, must be fully respected by the federal courts. We should further note that if *Growe* stood alone as the authority on the issue before us—that is, if we could disregard Article I, Section 4 and the cases we have referred to earlier—we would dismiss the plaintiffs' claim forthwith. However, we cannot ignore the Constitution and other Supreme Court authority, so we turn now to examine *Growe* and to determine if, indeed, it is contrary to or requires us to disregard our earlier conclusion that there must be a source of legislative authority for congressional redistricting.

**7.** While we recognize that there have been a number of cases in which state courts have exercised the power to redistrict congressional seats, none of these cases has addressed the Article I, Section 4 question.

In California, on two occasions the Supreme Court of the state has reapportioned congressional districts. *Legislature v. Reinecke*, 10 Cal.3d 396, 401, 110 Cal.Rptr. 718, 516 P.2d 6 (Cal.1973) (In Bank); *Wilson v. Eu*, 1 Cal.4th 707, 4 Cal.Rptr.2d 379, 823 P.2d 545 (Cal.1992) (In Bank). In both cases, the California Supreme Court acted under its original mandate jurisdiction, as granted to the court in the state constitution, which of course provides a source of law for the state. *See* Cal. Const. Art. VI, § 10. The Article I, Section 4 issue was not raised.

In New York, although the New York Supreme Court, Kings County, drew a congressional redistricting plan for the state after the Legislature failed to do so, this plan subsequently was adopted by the legislature and then precleared by the Justice Department. *See Reid v. Marino*, Index No. 9567–92 (N.Y. Sup.Ct., Kings Co.1992); *Puerto Rican Legal Defense & Education Fund v. Gantt*, 796 F.Supp. 677 (E.D.N.Y.), *vacated and dismissed as moot, Gantt v. Skelos*, 506 U.S. 801, 113 S.Ct. 30, 121 L.Ed.2d 3 (1992); *Puerto Rican Legal Defense & Education Fund v. Gantt*, 796 F.Supp. 681, 697–98 (E.D.N.Y.1992); *Puerto Rican Legal Defense and Education Fund v. Gantt*, 796 F.Supp. 698, 699 (E.D.N.Y.1992). The Article I, Section 4 issue was not raised.

In Texas, the Legislature failed to adopt a congressional reapportionment plan during its 2001 session, and the Texas Supreme Court stated that "[w]hen the Legislature does not act, citizens may sue and, then, it is the judiciary's role to determine the appropriate redistricting plan." *Perry v. Del Rio*, 2001 WL 1285081, *5 (Tex. Oct.19, 2001). However, the Texas Supreme Court rejected the plan adopted by the trial court in that case, and a federal three-judge panel proceeded to trial and implemented its own redistricting plan. *See Balderas v. Texas*, No. 6:01–CV–158 (E.D.Tex. Nov. 14, 2001). Again, the Article I, Section 4 issue was not raised.

Finally, the New Jersey Supreme Court ordered a minor change in a congressional redistricting statute adopted by the New Jersey Legislature in order to reduce the population disparity among districts from 851 people to thirteen people. *See Koziol v. Burkhardt*, 51 N.J. 412, 416–17, 241 A.2d 451 (1968). The court noted that its practice ordinarily was to leave such changes to the legislature, but because the case was heard by the court on April 2nd, decided on April 3rd, and "the election statute requires administrative action by April 5 and since the required alterations would not depart from the basic legislative plan, it seems fitting for the Court to direct the necessary changes, subject of course to the power of the Legislature to adopt another plan consonant with constitutional principles." *Id.* at 417, 241 A.2d 451. The Article I, Section 4 issue was not discussed.

In *Growe*, a number of plaintiffs filed suit in state court, challenging the existing *legislative and congressional* districts in Minnesota under the 14th Amendment to the United States Constitution and the Minnesota Constitution Article 4, Section 2, i.e., the one person-one vote principle, in the light of the new census. The parties stipulated that the existing districts were unconstitutional, and the Minnesota Supreme Court appointed a Special Redistricting Panel, consisting of one appellate judge and two district judges, to preside over the case. *Id.* at 28, 113 S.Ct. 1075. The Minnesota Supreme Court did so because "[t]he Chief Justice has authority to appoint a special redistricting panel under Minn.Stat. §§ 2.724 and 480.16." [8] *Cotlow v. Growe*, 622 N.W.2d 561, 562 (Minn. 2001).[9] Meanwhile, two suits were filed in federal court and a federal three-judge panel was convened to hear the consolidated cases. *Growe*, 507 U.S. at 28, 113 S.Ct. 1075. After a period of deferral to allow the state legislature to act, the federal court stayed the proceedings in state court, which had developed a redistricting plan, proceedings and ultimately adopted its own federal plan for state legislative and for congressional redistricting plans. *Id.* at 30–31, 113 S.Ct. 1075. The Supreme Court held that the district court erred in not deferring to the state court's timely consideration of legislative and congres-

sional reapportionment. *Id.* at 36–37, 113 S.Ct. 1075.

The Supreme Court in *Growe* indicated that state courts have a significant role in redistricting. *Growe* declares:

> In the reapportionment context, the Court has required federal judges to defer consideration of disputes involving redistricting where the State, through its legislative or judicial branch, has begun to address that highly political task itself.... [T]he Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts. See U.S. Const., Art. I, § 2. 'We say once again what has been said on many occasions: reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.' *Chapman v. Meier*, 420 U.S. 1, 27, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975).

507 U.S. at 34, 113 S.Ct. 1075. To place the holding of the Supreme Court in context, we start with the pivotal observation that the Article I, Section 4 issue was not discussed or even raised in *Growe* because—unlike this case—the parties did not dispute the constitutional jurisdiction of the state court. *See id.* at 32, 113 S.Ct. 1075. (*See also Texas v. Cobb*, 532 U.S. 162, 168, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001) ("Constitutional rights are not defined by inferences from opinions which

---

**8.** Minn.Stat. § 2.724 provides in relevant part: "When public convenience and necessity require it, the chief justice of the supreme court may assign any judge of any court to serve and discharge the duties of judge of any court in a judicial district not that judge's own at such times as the chief justice may determine." Minn.Stat. § 480.16 provides:

> The chief justice shall consider all recommendations of the court administrator for the assignment of judges, and has discretionary authority to direct any judge whose calendar, in the judgment of the chief justice, will permit, to hold court in any coun-

ty or district where need therefor exists, to the end that the courts of this state shall function with maximum efficiency, and that the work of other courts shall be equitably distributed. The supreme court may provide by rule for the enforcement of this section and section 480.17.

**9.** This case involved a motion to reopen the original *Cotlow* case, which was the case pending before the three-judge state court when the *Growe* case was brought in federal court and decided.

did not address the question at issue."))
Without objection from any party, the
Minnesota Supreme Court relied on its
specific authority under the statutes of
Minnesota to assign judges to hear cases
"where need therefor exists," and appoint-
ed a three-judge panel. We also note that
*Chapman,* relied on by the Court in
*Growe,* involved only the reapportionment
of the state legislature, not congressional
districts, and therefore no Article I, Sec-
tion 4 question could have been implicated.

It is certainly true that the Supreme
Court chastised the federal court in *Growe*
for dismissing the role of the state court in
the redistricting process. Nevertheless,
we cannot conclude that *Growe* stands for
the proposition that we may disregard Ar-
ticle I, Section 4, or these previously cited
Supreme Court authorities. This conclu-
sion is undergirded by the facts that: Arti-
cle I, Section 4 was not raised in *Growe;*
the earlier Supreme Court cases address-
ing Article I, § 4 were not referred to,
much less overruled, *see United States v.
Hatter,* 532 U.S. 557, 567, 121 S.Ct. 1782,
149 L.Ed.2d 820 (2001) ("it is [the Su-
preme] Court's prerogative alone to over-
rule one of its precedents") (internal quo-
tation marks and citations omitted); the
*Chapman* case relied upon in *Growe* in-
volved only a state court redistricting the
state legislature, not congressional redis-
tricting; and, finally, there was some, al-
beit tenuous, legislative authority for the
Minnesota Supreme Court's action in
*Growe.*

Thus, based on our understanding of the
constitutional provision in the light of its
plain language and the case authority
when considered as a whole, we hold: Arti-
cle I, § 4 requires a state to adopt a
congressional redistricting plan in a man-
ner that comports with legislative authori-
ty as defined by state law.

## III

### *Authority of the Chancery Court*

█ In the case before us, we can find
no legislative act upon which to base the
chancery court's authority to act in con-
gressional redistricting. Unlike in Minne-
sota and California, the Mississippi Su-
preme Court has appellate jurisdiction
only.[10] While the Mississippi legislature
has empowered other state bodies to redis-
trict a number of *state* electoral districts, it
has not authorized any other state body,
including the chancery court, to redistrict
*congressional* districts. For example, the
state constitution grants the Mississippi
Supreme Court the authority to redistrict
circuit and chancery court districts in the
State of Mississippi when the legislature
fails to do so. *See* Miss. Const. Art. 6,
§ 152. In another instance, the legislature
has provided that if it is unsuccessful in
redistricting state legislative districts, a
five-member commission will redistrict the
state. Miss. Const. Art. 13, § 254. This
commission consists of the chief justice of
the Mississippi Supreme Court as chair-
man, and the attorney general, secretary
of state, speaker of the house of represen-
tatives, and president pro tempore of the
senate. *Id.* There is no similar legislative
grant for redistricting congressional dis-
tricts. Further, there is no statutory au-
thority in Mississippi for Supreme Court
judges to assign individual judges to hear
cases when the public necessity requires,
unlike in Minnesota.

The intervenors argue that the Missis-
sippi chancery courts have jurisdiction

---

10. The Constitution of the State of Mississippi
   provides:
   The Supreme Court shall have such juris-
   diction as properly belongs to a court of
   appeals and shall exercise no jurisdiction

on matters other than those specifically
provided by this Constitution or by general
law.
Miss. Const. Art. 6, § 146. *See also* Miss.
Code Ann. § 9–3–9.

over "[a]ll matters in equity," Miss. Const. Art. 6, § 159, and that this constitutes the authority for the Hinds County Chancery Court to redistrict the state for congressional elections. However, the Mississippi Supreme Court has specifically held, in the past, that the state chancery courts have no jurisdiction over a complaint that sought to enjoin congressional elections on the ground that a congressional redistricting statute adopted by the state legislature violated a federal statute which required congressional districts to contain "as nearly as practicable an equal number of inhabitants." *See Brumfield v. Brock*, 169 Miss. 784, 142 So. 745, 746 (1932). "By a long line of decisions this court has held that courts of equity deal alone with civil and property rights and not with political

rights." *Id.* In 1994, the Mississippi Supreme Court stated: "Chancery courts in this state do not have the jurisdiction to enjoin elections or to otherwise interfere with political and electoral matters which are not within the traditional reach of equity jurisdiction." *In re McMillin*, 642 So.2d 1336, 1339 (Miss.1994).

It is true, of course, that in *In re Mauldin*, No.2001–M–01891 (Miss.Sup.Ct., Dec. 13, 2001), the Mississippi Supreme Court held that this Hinds County Chancery Court did have jurisdiction over the state lawsuit brought in the instant case.[11] The court did not provide any basis for its holding, did not refer to its earlier cases to the contrary, and did not point to any legislative authority that authorized the chancery court to act.[12]

---

11. The holding of the Mississippi Supreme Court stated, in its entirety:

> After due consideration the Court finds that the Hinds County Chancery Court has jurisdiction of this matter. The Court further finds that the request to dismiss the Plaintiffs' Amended Complaint is denied. The Court further finds that the request to transfer this cause to circuit court is denied, as is the request for stay of the December 14, 2001, trial date. Any congressional redistricting plan adopted by the chancery court in cause no. G–2001–1777 W/4 will remain in effect, subject to any congressional redistricting plan which may be timely adopted by the Legislature.

This language could be interpreted to suggest that the Mississippi Supreme Court intended that the State's congressional districts should be reapportioned by a single chancery judge with no appellate review. Although an appeal of the Chancery Court's judgment has been filed, there is no indication when and if the court will consider the merits of the appeal.

12. The Intervenors argue that *Adams County Election Comm'n v. Sanders*, 586 So.2d 829 (Miss.1991), gave the chancery court authority to redistrict congressional seats. However, *Adams County* only involved a request for an injunction against the County Election Commission, preventing it from conducting the primary and general elections for the Adams

County Board of Supervisors. The chancery court issued the injunction, but did not engage in the drawing of districts on its own. Further, *Adams County* did not involve congressional districts, which are governed by Article I, Section 4, but only county board of supervisors districts. Additionally, the Mississippi Supreme Court recognized "that state courts have concurrent jurisdiction with the federal courts to decide whether § 5 of the Voting Rights Act applies to contemplated changes in election procedures," but did not decide "which state court, chancery or circuit, should decide such questions . . . ." *Id.* at 831.

Deciding whether an official must submit a voting change for preclearance is to be distinguished from the actual drawing of congressional districts. The Mississippi Supreme Court has stated that a court "can direct an official or commission to perform its official duty or to perform a ministerial act, but it cannot project itself into the discretionary function of the official or the commission. Stated differently, it can direct action to be taken, but it cannot direct the outcome of the mandated function." *In re Wilbourn*, 590 So.2d 1381, 1385 (Miss.1991) (quotation omitted). Based on *Wilbourn*, the Mississippi Supreme Court has allowed a circuit court to enjoin the carrying out of city elections under an illegal election law "until the City could

In sum, we can only conclude that the requirements of Article I, Section 4 were not met in this case, as there has been no indication that the chancery court had any legislative authority to draw the state's congressional districts. Indeed, the Mississippi Supreme Court has specifically held that such matters do *not* fall within the equity jurisdiction of the chancery courts. Therefore, irrespective of whether the chancery court plan is precleared, the chancery court plan cannot be implemented by the State of Mississippi, because the chancery court's adoption of it, in the absence of any state legislative authority, violates Article I, Section 4.[13]

IV

*Remedy*

■ The precise question of an appropriate remedy for an Article I, Section 4 violation has not been addressed before. However, under established principles, this court has the authority to order the use of its own congressional redistricting plan in place of a state's plan if we find a constitutional violation in the state's plan. *See Hastert v. State Board of Elections,* 777 F.Supp. 634, 661 (N.D.Ill.1991) (finding Illinois's existing congressional districting plan unconstitutional and therefore "null and void," and ordering that the court's redistricting plan be used in the upcoming congressional election); *Shayer v. Kirkpatrick,* 541 F.Supp. 922, 934 (W.D.Mo.) (declaring state's existing congressional apportionment plan unconstitutional and ordering that the redistricting plan crafted by the court be used "until a timely new congressional redistricting act enacted by the State of Missouri takes effect"), *aff'd,* 456 U.S. 966, 102 S.Ct. 2228, 72 L.Ed.2d 841 (1982); *Carstens v. Lamm,* 543 F.Supp. 68, 100 (D.Colo.1982) (declaring existing state congressional districting plan unconstitutional, ordering use of plan developed by federal three-judge district court, and ordering defendant Colorado Secretary of State to be governed by and comply with the court's redistricting plan).[14]

amend its Charter in compliance with Miss. Code. Ann. § 21–17–9 (1990)." *City of Grenada v. Harrelson,* 725 So.2d 770, 773 (Miss. 1998). Again, this clearly is not the same issue as whether a chancery court judge has the power to draw congressional districts for the entire state.

**13.** Although a legislature may be able to delegate its powers granted under Article I, Section 4, this is not the factual circumstance presented to us. *See, e.g., Brady v. The New Jersey Redistricting Comm.,* 131 N.J. 594, 622 A.2d 843 (N.J.1992). The New Jersey Supreme Court upheld an Act, passed by the Legislature and signed into law by the Governor, which created the New Jersey Redistricting Commission, with responsibility for establishing the state's congressional districts. *Id.* at 601–02, 622 A.2d 843. The Act allowed the Republican and Democratic parties to each appoint six commissioners to the Commission, and allowed the twelve commissioners to select one independent member to serve as the Chairman of the commission and to vote only in the event of a tie. The Act provided the Commission with specific guidelines for drawing congressional districts, i.e., equality in population, preservation of minority communities, contiguity, and preservation of continuity in congressional districts. *Id.* at 602–03, 622 A.2d 843. The Court found that the Commission did not violate Article I, Section 4 because it involved a valid delegation of legislative powers to a "specialized form of administrative agency," the discretion of which was "hemmed in by standards sufficiently definitive to guide its exercise." *Id.* at 607–08, 622 A.2d 843 (citations and quotation marks omitted). The court also noted that the Act was passed pursuant to the lawmaking process of the state, i.e. was passed by both houses of the legislature and signed by the Governor. *Id.* at 610, 622 A.2d 843. We note that the Act provided it would expire on January 1, 2001. *See* 1991 N.J. Laws, c. 510, § 12.

**14.** The plaintiffs also argue that their due process rights were violated by the state court proceeding. However, because the plaintiffs were not parties to the state court proceeding and they are attempting to raise the rights of

## V

### Conclusion

In the light of the foregoing analysis, the congressional redistricting plan adopted by the chancery court is declared unconstitutional, and the state's implementation of the chancery court plan is enjoined, as per our Final Judgment entered today.

### FINAL JUDGMENT

For the reasons stated in our opinions of February 19, 2002, and February 26, 2002, the defendants are hereby enjoined from implementing the congressional redistricting plan adopted by the Chancery Court for the First Judicial District of Hinds County, Mississippi.

It is further ordered that the defendants are enjoined from implementing the former five-district congressional redistricting plan codified at Miss.Code Ann. § 25–15–1037.

It is further ordered that the defendants implement the congressional redistricting plan adopted by this court in its order of February 4, 2002, for conducting congressional primary and general elections for the State of Mississippi in 2002.

It is further ordered that the defendants shall use the congressional redistricting plan adopted by this court in its order of February 4, 2002, in all succeeding congressional primary and general elections for the State of Mississippi thereafter, until the State of Mississippi produces a constitutional congressional redistricting plan that is precleared in accordance with the procedures in Section 5 of the Voting Rights Act of 1965.

This court shall retain jurisdiction to implement, enforce, and amend this order as shall be necessary and just.

---

third parties, they do not have standing to raise this issue in this court. *See U.S. Dept. of Labor v. Triplett,* 494 U.S. 715, 720, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990) ("[A] litigant must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties. This is generally so even when the very same allegedly illegal act that affects the litigant also affects a third party.") (citations and quotation marks omitted).